ESTATE OF WILLIAM F. RUNNELS, DECEASED, LOU ELLA RUNNELS, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LOU ELLA RUNNELS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5939-67, 5940-67.    Filed April 13, 1970.

*Williard A. Herbert*, for the petitioners.
*John W. Dierker*, for the respondent.

## OPINION

FEATHERSTON, *Judge:* In these consolidated cases respondent determined deficiencies for 1964 in the income tax of the Estate of William F. Runnels, deceased, Lou Ella Runnels, executrix, in the amount of $11,206.18, and Lou Ella Runnels in the amount of $9,655.57.

The issues for decision are:

(1) Whether cancellation of petitioners' indebtedness to Runnels

Chevrolet Co. in consideration of the redemption of part of its outstanding stock was essentially equivalent to a dividend under section 302(b)(1);[1] and

(2) Whether the amount of income realized by petitioner Lou Ella Runnels from use of an automobile owned by Runnels Chevrolet Co. should be computed at the rate of 10 cents per mile, as contended for by respondent, or 5 cents per mile, as maintained by her.

All of the facts are stipulated.

Lou Ella Runnels (hereinafter referred to as Lou Ella) filed one of the petitions herein (docket No. 5940–67) as an individual and the other (docket No. 5939–67) as executrix of the estate of her deceased son, William F. Runnels. At the time she filed the petitions she was a legal resident of Center, Tex. She filed timely original and amended income tax returns for 1964 for herself and William's estate with the district director of internal revenue, Dallas, Tex.

As of January 1, 1963, Lou Ella owned 95 shares and William 105 shares of stock in Runnels Chevrolet Co. (hereinafter Runnels Chevrolet or the corporation). These 200 shares were all of the corporation's outstanding capital stock. Thus the percentages of ownership as of that date were 47.5 percent for Lou Ella and 52.5 percent for William.

Sometime in 1963 construction began on a building located on land owned by Lou Ella and William. Runnels Chevrolet paid the costs of construction and charged the payments on its books to an account entitled "Accounts Receivable—Officers." As of June 9, 1964, a total of $68,122.87 had been charged to this account for this purpose, $32,411.74 to Lou Ella and $35,711.13 to William.

On May 1, 1964, Runnels Chevrolet declared a stock dividend of 800 shares of $100 par value stock, 380 of which were issued to Lou Ella and 420 to William. After the stock dividend Lou Ella and William each owned the same percentage of the corporation's stock as before.

On June 9, 1964, Runnels Chevrolet issued a check to Lou Ella in the amount of $68,122.87. On the same date she gave her personal check to the corporation in the same amount. Simultaneously, Lou Ella and William, respectively, transferred 167 and 184 of their shares of stock to the corporation. Runnels Chevrolet treated the shares which it received from Lou Ella and William as treasury shares and credited the "Accounts Receivable—Officers" account with the amount of $68,122.87.

Runnels Chevrolet had earned surplus and undivided profits of $179,960.09 as of January 1, 1964, and $83,575.40 as of December 31, 1964.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

On her 1964 amended return Lou Ella reported the gain on the redemption of her stock as follows:

| Description of property | Date acquired | Date sold | Gross sales price | Cost | Long-term capital gain |
|---|---|---|---|---|---|
| Runnels Chevrolet___ | 10/24/62 | 6/9/64 | $32, 411. 74 | $26, 247. 89 | $6, 163. 85 |

On its 1964 amended return William's estate reported the gain on the transaction as follows:

| Description of property | Date acquired | Date sold | Gross sales price | Cost | Long-term capital gain |
|---|---|---|---|---|---|
| Runnels Chevrolet___ | 10/24/62 | 6/9/64 | $35, 711. 13 | $26, 516. 05 | $9, 195. 08 |

Respondent determined that the amounts received by petitioners on the redemptions of their stock were taxable as ordinary income, rather than as long-term capital gain, on the ground that such redemptions were essentially equivalent to dividends.

The tax consequences of a redemption of stock are governed by section 302.[2] Section 302(a) provides that a stock redemption shall be treated as an exchange, and thus eligible for capital gains treatment, if it meets any one of the four tests of section 302(b). Under the first two of these tests,[3] it must be shown that the redemption (1) "is not essentially equivalent to a dividend" or (2) "is substantially disproportionate with respect to the shareholder." Section 302(c)(1) provides, in relevant part, that the stock-ownership attribution rules of section 318(a) shall apply. Under section 318(a)(1)[4] Lou Ella is considered as having owned William's stock and he constructively owned hers. *United States* v. *Davis*, 397 U.S. 301, (1970).[5] Conse-

---

[2] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

[3] The third test, which deals with termination of a shareholder's interest through complete redemption of all of his stock, sec. 302(b)(3), obviously is not applicable here, since Lou Ella and William both had substantial stock ownership in the corporation after the redemption; and the fourth test, sec. 302(b)(4), is not relevant since it pertains only to redemption of the stock of certain railroad corporations.

[4] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

(1) MEMBERS OF FAMILY.—

(A) IN GENERAL.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

* * * * * * *

(ii) his children, grandchildren, and parents.

[5] Petitioner argues that the attribution rules of sec. 318(a) are unconstitutional when applied in this context. We find no merit in the argument, and *United States* v. *Davis*, 397 U.S. 301 (1970), implicitly rejects it.

quently, each constructively owned 100 percent of the stock of Runnels Chevrolet both before and after the redemption, and the substantially-disproportionate requirement of section 302(b)(2) is not satisfied.

Even disregarding the attribution rules, the transaction clearly does not meet the substantially-disproportionate test. William received the benefit of 52.42 percent and Lou Ella 47.58 percent of the debt cancellation. After the stock redemption, Williams owned 52.54 percent and Lou Ella 47.46 percent of the stock, compared with their respective percentage ownership of 52.5 and 47.5 before the transaction. Such minimal differences certainly do not show a disproportionate redemption.

There remains only the inquiry under paragraph (1) of section 302 (b)—whether the transaction was "essentially equivalent to a dividend." The resolution of this issue depends upon the facts of each case. *United States* v. *Fewell*, 255 F. 2d 496, 499 (C.A. 5, 1958); sec. 1.302–2 (b), Income Tax Regs. A variety of factors have been considered by the courts, the most important of which are whether the distribution was pro rata among the shareholders—generally a decisive factor, sec. 1.302–2(b), Income Tax Regs.; *United States* v. *Fewell*, *supra*—and whether the transaction affected the relationship of the shareholders to the corporation. *Flanagan* v. *Helvering*, 116 F. 2d 937, 939 (C.A.D.C. 1940); accord, *Levin* v. *Commissioner*, 385 F. 2d 521, 527–528 (C.A. 2, 1967), affirming 47 T.C. 258 (1966).[6] In *Ballenger* v. *United States*, 301 F. 2d 192, 196 (C.A. 4, 1962), the court's role was described in these terms:

the court must hypothesize a situation where the corporation did not redeem any stock, but instead declared a dividend for the same amount. The court then must examine the situation after the dividend and compare it with the actual facts of the case when stock was redeemed, viewed always from the shareholders' vantage point. The redemption is equivalent to a dividend if the results from the hypothetical dividend and the actual stock redemption are essentially the same. * * *

In *United States* v. *Davis*, *supra*, the Supreme Court emphasized that S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 234 (1954), explaining the 1954 Code, declared that in applying the dividend-equivalence test "the inquiry will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation." As to the merits of the case before it, the Court made the following observation, which is quite pertinent to the instant controversy:

After application of the stock ownership attribution rules, this case viewed most simply involves a sole stockholder who causes part of his shares to be re-

---

[6] Until recently a conflict existed as to whether the presence of a business purpose was a relevant factor. However, in *United States* v. *Davis*, *supra*, the Supreme Court held that the Court of Appeals was "wrong in looking for a business purpose and considering it in deciding whether the redemption was equivalent to a dividend."

deemed by the corporation. We conclude that such a redemption is always "essentially equivalent to a dividend" within the meaning of that phrase in § 302(b) (1) * * *

Even if the stock-ownership attribution rules are not relied on, the record here presents a classical example of a corporate distribution which is essentially equivalent to a dividend. Runnels Chevrolet had a large accumulation of earnings and profits and had loaned its shareholders funds substantially in proportion to their stockholdings. The corporation then canceled the indebtedness, the shareholders thereby receiving, in effect, a benefit commensurate with their stock ownership. True, the corporation first declared a stock dividend, and the stockholders, Lou Ella and William, then returned some of the stock to the corporation. But these transactions in the corporation's stock took nothing from their interests and added nothing to the property of the corporation, i.e., did not affect the stockholders' relationship to the corporation in any significant way.

The only practical effect of the series of transactions was to transfer to the shareholders a part of the corporation's accumulated earnings and profits equal to their indebtedness to it. "Had the debt simply been cancelled, it would surely have been a dividend; the redemption of some stock in no way changes the effect of the transaction." *McGinty* v. *Commissioner*, 325 F. 2d 820, 822 (C.A. 2, 1963), affirming 38 T.C. 882 (1962).

Petitioners contend that the transaction should be viewed as a sale of the building by the corporation to Lou Ella and William in consideration of cash and some of its stock, citing *Johnson-McReynolds Chevrolet Corporation*, 27 T.C. 300 (1956), and sec. 1.311–1(e) (1), Income Tax Regs. The *Johnson-McReynolds* case involved the effect of a transaction on a corporation's tax liability, and the cited regulation similarly speaks to the tax consequences to a corporation, providing that "if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though payment had been made in any other property."

Regardless of whether the rule as to the recipient corporation applies also to the stockholder, we find no merit in petitioners' contention. One obvious, fatal weakness of the argument is that there is no evidence to support it. Runnels Chevrolet never owned the building. It is stipulated that: "In 1963 construction began on a building located on land owned by Lou Ella Runnels and William F. Runnels. The completed building was owned by Lou Ella Runnels and William F. Runnels." Indeed, in his opening statement counsel for petitioners stated that Lou Ella and William "borrowed" money from Runnels Chevrolet to construct the building and that "this building was to be owned by them." Thus, neither *Johnson-McReynolds* nor the regulation is apposite.

We sustain respondent's determination that the redemptions of petitioners' stock were essentially equivalent to dividends.

As to the second issue, no evidence whatever has been presented. The deficiency notice issued to Lou Ella determined that she realized income in the amount of $1,200 for her use of an automobile owned and made available to her by Runnels Chevrolet. The computation of the increase in income was explained by the following: "12,000 miles driven at 10¢ per mile=$1,200.00." In the absence of any evidence to the contrary, we must sustain respondent's determination. *Gordon S. Dole*, 43 T.C. 697, 707 (1965), affirmed per curiam 351 F. 2d 308 (C.A. 1, 1965).

Lou Ella argues that Rev. Proc. 64–15, 1964–1 C.B. (Part 1) 676, sets forth the rule that the cost of operating an automobile is 5 cents per mile and that her additional income from use of the automobile should be computed on that basis. But argument is not a satisfactory substitute for evidence on this purely factual issue. Moreover, Rev. Proc. 64–15 does not aid her. As a guideline, it provides that 5 cents per mile may be used in computing deductions allowable under sections 170 (charitable contributions) and 213 (medical expenses) for the use of an automobile; it is based in part on the premise that, because of the limiting language of sections 170 and 213, only the expenses incurred for the operation, repair, and maintenance of an automobile—not its fair rental value or the depreciation occasioned by its use—may be taken into account in computing the amount of the allowable deductions. No. similar limiting language appears in sections 61 or 316. On the contrary, it is well established that the amount of the constructive dividend—the value of the benefit of using the automobile—may be measured by the combined cost of operating the automobile and its depreciation. See *Rodgers Dairy Co.*, 14 T.C. 66, 73–74 (1950); *Challenge Manufacturing Co.*, 37 T.C. 650, 663 (1962). We find nothing in Rev. Proc. 64–15 to establish that, as a matter of law, respondent's determination was erroneous.

*Decisions will be entered for the respondent.*