FEHRS FINANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2136–69. Filed May 1, 1972.

*William A. Cromartie* and *William E. Barrows*, for the petitioner.
*James T. Finlen, Jr.*, for the respondent.

SIMPSON, *Judge:* The respondent has determined a deficiency of $32,459.07 in the petitioner's Federal income tax for the year ended November 30, 1965. In a transaction which we conclude was a redemption under section 304(a)(1) of the Internal Revenue Code of 1954,[1] the petitioner acquired stock in exchange for a promise to pay two annuities, and immediately thereafter it sold such stock prior to making any annuity payments. To determine the petitioner's basis in such stock, we must decide whether the redemption was essentially equivalent to a dividend under section 302(b)(1), whether the transferors of the stock completely terminated their interest in the corporation within the meaning of section 302(b)(3), and how much gain, if any, was recognized by the transferors on the transfer within the meaning of section 362(a).

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Fehrs Finance Co., is a Nebraska corporation which had its principal place of business at Omaha, Nebr., when the petition was filed in this case. It filed its Federal income tax return for the, taxable year ended November 30, 1965, using the cash method of accounting, with the district director of internal revenue, Omaha, Nebr.

Fehrs Rental Co. (Rental)[2] is a corporation which was incorporated in Nebraska in 1954, primarily to rent, lease, sell, and repair road and

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

[2] In about 1960, Rental merged with another corporation, Fehrs Tractor & Equipment Co., with Rental being the surviving corporation. Pursuant to an amendment of the articles of incorporation on Mar. 1, 1965, Rental changed its corporate name to Fehrs Tractor & Equipment Co. However, for purposes of clarity, we shall refer to such corporation consistently as Rental.

industrial construction equipment. Prior to December 21, 1964, Edward J. Fehrs owned 1,223 of the 1,380 outstanding shares of Rental, and his wife, Violette E. Fehrs, owned the remaining 157.

On December 21, 1964, Mr. Fehrs gave a total of 130 shares of Rental to certain of his relatives, as follows: 10 to Mrs. Fehrs; 15 to his son-in-law, William R. Vlcek; 15 to his daughter, Mary Jane Vlcek; 10 each to his 3 grandchildren, William Vlcek, Jr., Linda Vlcek, and Sharon Vlcek; and 60 to his daughter, Elizabeth Fehrs May. On January 11, 1965, he gave an additional 111 shares of Rental to such relatives, as follows: 10 to Mrs. Fehrs; 10 to Mr. Vlcek; 11 to Mrs. Vlcek; 10 each to the same 3 grandchildren; and 50 to Mrs. May. After such gifts were made, Mr. Fehrs owned 982 shares of Rental, Mrs. Fehrs owned 177, and 221 shares were owned by his son-in-law, his daughters, and his grandchildren.

On February 28, 1965, the petitioner was incorporated in Nebraska. Its principal business has been the acquisition of commercial paper generated by sales of construction equipment by Rental. Upon its organization, the petitioner issued 19 shares of capital stock at $100 each. Ten of such shares were subscribed to and paid for at par value by Mrs. May, and nine of such shares were subscribed to and paid for at par value by Mrs. Vlcek. Neither Mr. Fehrs nor Mrs. Fehrs has ever been a shareholder, officer, director, or employee of the petitioner.

On March 1, 1965, Mr. and Mrs. Fehrs transferred their remaining shares in Rental to the petitioner. On that date, their basis in the stock of Rental was zero. In return for the 982 shares it acquired from Mr. Fehrs, the petitioner promised to pay him the amount of $62,000 per year, payable $15,500 quarterly, beginning January 1, 1966, and continuing for the remainder of his life. In return for the 177 shares it acquired from Mrs. Fehrs, the petitioner promised to pay her the amount of $8,000 per year, payable $2,000 quarterly, beginning January 1, 1966, and continuing for the remainder of her life. The agreements by which the petitioner agreed to make such payments to Mr. and Mrs. Fehrs (the annuity agreements) were authorized by the petitioner's board of directors at its first meeting on March 1, 1965, and such agreements were signed by Mr. Vlcek in his capacity as the petitioner's president, to which position he had been elected at that meeting.

Later, on March 1, 1965, there was a special meeting of the board of directors of Rental, at which Mr. Fehrs resigned as president and as a director. The minutes of such meeting indicated that Mr. Fehrs "had reached retirement age and had decided to terminate his relationship with the corporation." Since such time, Mr. Fehrs has been

retired, and neither he nor Mrs. Fehrs has been a shareholder, officer, director, or employee of Rental. Also at such meeting, Mrs. Vlcek was elected to fill Mr. Fehrs' unexpired term on the board, and Mr. Vlcek was elected to succeed Mr. Fehrs as president.

The annuity agreement pertaining to Mr. Fehrs contained substantially the same terms as that pertaining to Mrs. Fehrs. The annuity agreements provided that if the petitioner defaulted in making any payment due thereunder, and the default continued for 30 days, the "entire commuted value of the annuity" would be immediately due and payable, "such commuted value to be computed in accordance with standard actuarial tables and values taking into account the age of the annuitant as of the date of default." Such default provision could be waived in writing by the annuitant. The annuity agreements provided further that neither such agreements nor the payments to be made thereunder could be negotiated, assigned, or anticipated by the annuitants, and that the petitioner would have no obligation to recognize or give effect to any such purported negotiation, assignment, or anticipation.

Mr. Fehrs was born on December 5, 1894, and Mrs. Fehrs was born on July 9, 1900. If the petitioner desired, in 1965, to purchase commercial annuities for Mr. and Mrs. Fehrs to discharge all of its liabilities to them under the annuity agreements, such commercial annuities would have cost the petitioner approximately $550,000 for Mr. Fehrs, and approximately $105,000 for Mrs. Fehrs, or a total of approximately $655,000. On the books and records of the petitioner, and on its corporate income tax return for the taxable year ended November 30, 1965, the obligation to Mr. and Mrs. Fehrs was reflected as a liability as of March 1, 1965, in the total amount of $725,000.

On March 1, 1965, the same day on which it acquired the 1,159 shares of Rental from Mr. and Mrs. Fehrs, the petitioner and Rental executed a document entitled "Redemption Agreement." Pursuant to the terms of such document, the petitioner transferred to Rental the 1,159 shares of such corporation. In exchange for such stock, Rental transferred to the petitioner the sum of $100,000 in cash, and an unsecured negotiable promissory note of Rental in the principal sum of $625,000. The note provided for annual payments of principal and interest. Each principal payment was set at 5 percent of the original principal or 25 percent of Rental's annual net income after Federal income taxes, whichever was greater; the interest rate was 7 percent per annum. The annual payments were to be made on January 2 of each year, commencing with 1966.

On the books and records of the petitioner, the $625,000 note of Rental was treated as a contract receivable. On its Federal corporate income tax return for the taxable year ended November 30, 1965, such note was included in the category of notes and accounts receivable.

The 1,159 shares of Rental which it acquired from the petitioner were canceled on April 16, 1965, pursuant to a resolution adopted by Rental's board of directors. After such cancellation, 221 shares of Rental remained outstanding, and those shares were owned by Mr. and Mrs. Fehrs' daughter, son-in-law, and grandchildren, as a result of the gifts by Mr. Fehrs in 1964 and 1965.

Rental's Federal income tax return for the taxable year ended September 30, 1964, shows that its earned surplus and undivided profits at the close of such year amounted to $1,229,103.78. Its return for the taxable year ended September 30, 1965, shows that its earned surplus and undivided profits would have amounted to $1,410,149.20 at the close of that year, but for the "reduction of capital" in the amount of $609,100 during the year. It paid no dividends to its shareholders from the time of its incorporation until January 2, 1966.

Except for its ownership of the 1,159 shares as described, the petitioner has never owned any stock of Rental; and Rental has never owned any stock of the petitioner.

In December 1965, Rental was advised that the petitioner had requested a prepayment to the extent of $300,000 with respect to the principal amount owed by Rental to the petitioner pursuant to the redemption agreement. The petitioner agreed, in consideration of such prepayment, to waive any interest due and owing on the balance of the principal sum for a 5-year period from December 1, 1965. On December 27, 1965, Rental made the prepayment of $300,000 to the petitioner on those terms. Subsequently, Rental made further payments of principal to the petitioner as follows: $41,122 on January 3, 1966; $35,560.16 on January 11, 1967; and $31,250 on December 14, 1967.

At an annual meeting of the petitioner's board of directors on December 27, 1965, the directors discussed in detail a copy of a preliminary profit-and-loss statement for the year ended November 30, 1965. After the discussion, the directors declared a dividend at the rate of $4,000 per share payable January 2, 1966, to the shareholders of record on November 30, 1965. During the calendar years 1966, 1967, and 1968, the petitioner paid dividends in the total respective amounts of $76,000, $38,000, and $38,000 to its shareholders; such amounts were paid ten-nineteenths to Mrs. May and nine-nineteenths to Mrs. Vlcek. After treating the dividends paid in 1966 as recoveries of their bases to the extent applicable, both of them treated the dividends as long-

term capital gains in their own Federal income tax returns for 1966 and 1967, and Mrs. Vlcek, at least, did the same for 1968.

The petitioner's books and Federal income tax returns showed increased deficits in the category of earned surplus and retained earnings, as follows:

YEAR ENDED NOV. 30

|  | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|
| Balance at beginning of year | 0 | ($95,033.32) | ($133,305.21) | ($174,449.68) |
| Net income as shown on books | ($19,033.32) | (271.89) | (3,144.47) | (9,850.82) |
| Cash distributions to shareholders during year | 76,000.00 | 38,000.00 | 38,000.00 | 38,000.00 |
| Balance at end of year | (95,033.32) | (133,305.21) | (174,449.68) | (222,300.50) |

Such figures were based on the assumptions that none of the amounts received from Rental on account of the stock transfer constituted gain which should be reflected in the petitioner's earnings and profits, and that all of the distributions made by the petitioner to its shareholders when the corporation apparently lacked earnings and profits should serve to increase the deficit balance in the earned surplus and retained earnings account.

The district director of internal revenue, Omaha, Nebr., determined deficiencies in the gift taxes of both Mr. and Mrs. Fehrs for the year 1965, in the amounts of $28,700.42 and $22,214.94, respectively. Such deficiencies were based on the following computations by him: That on March 1, 1965, the stock of Rental was worth $700 per share; that the total values of the stock transferred by Mr. and Mrs. Fehrs respectively were $687,400 and $123,900; that the actuarial values of the annuities received by Mr. and Mrs. Fehrs respectively were $474,319.76 and $78,054.08; and that the differences between the values of the stock and the annuities constituted gifts to the shareholders of the petitioner by Mr. and Mrs. Fehrs in the respective amounts of $213,080.24 and $45,845.92.

Mr. and Mrs. Fehrs paid the gift tax deficiencies in the amounts determined by the district director, and on April 14, 1969, they each filed a claim on Form 843 for the refund of the gift taxes paid pursuant to the deficiency determinations, in addition to other gift taxes which they paid along with returns filed on April 15, 1966, plus interest. In such claims, the Fehrses alleged that the respondent erred in concluding that a gift resulted from the exchange of Rental stock for the annuity.

In 1966, 1967, and 1968, Mr. and Mrs. Fehrs received their annuity payments from the petitioner as called for by the annuity agreements. In their joint Federal income tax returns for 1966 and 1967,

Mr. and Mrs. Fehrs reported the annuity payments in the following manner:

| As annuity income: | Mr. Fehrs | Mrs. Fehrs |
|---|---|---|
| Investment in contract | $687, 400. 00 | $123, 900. 00 |
| Expected return | 719, 200. 00 | 145, 600. 00 |
| Percent of income to be excluded | 95. 58 | 85. 10 |
| Amount received this year | $62, 000. 00 | $8, 000. 00 |
| Amounts excludable | 59, 260. 00 | 6, 808. 00 |
| Taxable annuity income | 2, 740. 00 | 1, 192. 00 |
| As long-term capital gains received in current year: | | |
| 982 shares of Rental sold 3/1/65 | 59, 260. 00 | |
| 177 shares of Rental sold 3/1/65 | | 6, 808. 00 |

Mr. and Mrs. Fehrs' joint Federal income tax return for 1966 was examined by the respondent. A report of the examination, mailed to Mr. and Mrs. Fehrs on March 13, 1968, proposed adjustments resulting in a deficiency in income tax. The principal reason for such adjustments was the determination that the $70,000 in annuity payments received by the Fehrses in 1966 actually represented a "distribution essentially equivalent to a dividend," and that such payments should therefore be taxed as ordinary income, not as capital gain and annuity income. The report termed the 1965 transaction in which the stock was exchanged for the annuities as a "sham," and alleged that the dividend came from a "source other than the annuity." Mr. and Mrs. Fehrs executed a waiver of the restrictions on assessment and collection of the deficiency, and thereafter, they paid the deficiency and interest thereon. On June 30, 1969, Mr. and Mrs. Fehrs filed a claim for refund of the amount of such deficiency and interest; they alleged that the district director "erred in his determination that the taxpayers received 'dividend income (redemption of capital stock) $70,000' during the taxable year [1966]."

The gifts of his stock in Rental that Mr. Fehrs made to his wife, daughters, son-in-law, and grandchildren in December 1964 and January 1965 were made upon the advice of counsel; the amounts of such gifts were also determined upon the advice of counsel. At the time such gifts were made, Mr. Fehrs anticipated that he would retire from business in March 1965. He and his wife were concerned about their having sufficient income to live after his retirement, and about the manner in which ownership of Rental would pass to their daughters and son-in-law; the latter had been working for Rental for a substantial number of years. Mr. Fehrs was concerned that no outside

party would be interested in buying a corporation such as Rental; he felt that the alternatives were to liquidate it or to carry it on within the family. He also desired that the petitioner have a means of obtaining operating capital. Mr. and Mrs. Fehrs discussed these problems, as well as the matter of annuities, with their counsel prior to making the exchange. In fact, their counsel planned the formation of the petitioner and has assisted in the planning of its affairs.

For its taxable year ending November 30, 1965, the petitioner reported no gain or loss on account of the sale of the Rental stock. In the notice of deficiency in this case, the respondent determined that the petitioner realized a short-term capital gain in the amount of $725,000 from the alleged sale of the stock of Rental during the year in issue; the respondent determined that the petitioner should have recognized such gain in that year to the extent of the amount of the cash received: $100,000. The alleged gain of $725,000 is based on the theory that the petitioner's basis in the Rental stock was zero, and that its sales price on March 1, 1965, was $725,000, with $625,000 of such price being deferred.

## OPINION

The issue ultimately to be decided in this case appears to be simple: Did the petitioner realize a capital gain on the sale of the Rental stock in 1965? However, to reach that ultimate issue, we must work our way through an amazing maze of preliminary issues. At no time has the respondent taken the position that Rental's acquisition of its stock constituted a redemption under section 302 and that the payments received by the petitioner should be treated as dividends; at all times, he has treated such payments as a capital gain. The controversy revolves about the petitioner's basis in the stock. The respondent contends that section 304 is applicable to the petitioner's acquisition of stock from Mr. and Mrs. Fehrs and that its basis in such stock is therefore determined under sections 304 and 362(a). He concedes that if section 304 is applicable to the petitioner's acquisition of such stock, the gain which it realized on the transfer of such stock to Rental is taxable as a long-term capital gain. Thus, the initial issue for us to consider is whether section 304 is applicable to the petitioner's acquisition of the stock.

Section 304(a)(1) provides in relevant part that, if one or more persons are in "control" of each of two corporations, and if one of those corporations acquires stock in the other corporation from the person or persons in control, then the transaction shall be treated as a redemption under section 302. The stock shall be treated by the acquiring corporation as having been received as a contribution to its capital. The term "control" is defined in section 304(c)(1) as "the ownership of

stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock." Furthermore, section 304(c) (2) states that the rules contained in section 318(a) with respect to the constructive ownership of stock shall apply for the purpose of determining "control," except that the 50-percent limitations of sections 318(a) (2) (C) and 318(a) (3) (C) shall be disregarded for such purpose. Section 318(a) provides that an individual shall be considered as actually owning the stock which is owned by his spouse, his children, and his grandchildren.

Section 304(a) (1) applies to what is commonly referred to as a "redemption by related or brother-sister corporations." It is clear that by its terms, such section applies to the factual situation in this case. Immediately prior to the transactions here in issue, Mr. and Mrs. Fehrs actually owned 1,159 of the 1,380 outstanding shares of Rental, and their daughters and grandchildren owned 196 shares; thus, a total of 1,355 shares, or 98.2 percent of the outstanding stock, was actually or constructively owned by either Mr. Fehrs or Mrs. Fehrs. Only the 25 shares owned by Mr. Vlcek were not attributed to either of the Fehrses under section 318(a). All of the outstanding shares of the petitioner were owned by the daughters of the Fehrses, and were, therefore, similarly attributable to Mr. Fehrs or Mrs. Fehrs. Thus, either Mr. Fehrs or Mrs. Fehrs, or both, were regarded as the person or persons in control of both the petitioner and Rental prior to the transactions in issue. The transaction in which the petitioner acquired stock in Rental from Mr. and Mrs. Fehrs in return for the annuities must be treated as a redemption, and the stock of Rental so acquired must be treated as having been transferred by Mr. and Mrs. Fehrs to the petitioner as a contribution to its capital, under the express mandate of section 304(a) (1). See *Rose Ann Coates Trust*, 55 T.C. 501 (1970), on appeal (C.A. 9, June 17, 1971) ; *Ray A. Maher*, 55 T.C. 441 (1970), on appeal (C.A. 8, Oct. 12, 1971); *Ralph L. Humphrey*, 39 T.C. 199 (1962).

The petitioner's only serious objection to the applicability of section 304 is its contention that the respondent is estopped from raising such issue in this case by reason of his action in asserting and collecting a deficiency in gift tax from Mr. and Mrs. Fehrs on the basis that their transfer of the Rental stock to the petitioner constituted a gift in part. There has been a good deal of confusion in the development of the issues in respect of the petitioner's acquisition of stock from Mr. and Mrs. Fehrs and its sale of such stock to Rental. At first, the respondent took the position that the transfer of stock by Mr. and Mrs. Fehrs was in part a sale and in part a gift to the shareholders of the petitioner. Later, he changed his attack; with respect to the income tax liability of Mr. and Mrs. Fehrs for the year 1966, he took the posi-

tion that the $70,000 distributed to the Fehrses in such year was a "redemption distribution essentially equivalent to an ordinary dividend." In the notice of deficiency which led to this case, the respondent determined that the entire gain recognized by the petitioner in 1965 was taxable; although the notice said nothing expressly about the applicability of section 304, the result was apparently based on the premise that such section was applicable. In his opening statement in the trial of this case, the respondent's counsel did expressly adopt the position that section 304 is applicable. The petitioner contends that since the respondent initially took the position that such transfer was a sale and a gift, he cannot now contend that the transaction was a redemption. On the other hand, the respondent argues that since Mr. and Mrs. Fehrs have filed claims for refund of the gift taxes paid by them in which they alleged that no such gifts were made, the petitioner cannot now argue that the transfer was in part a gift.

So far as we know, the claims for refund are still pending, and there has been no final disposition of them. Since the Fehrses' gift tax liability has been challenged and the collection of that tax is not irrevocable, we need not even reach the question as to the consequences of an irrevocable payment of such tax; here, it is clear that the respondent's assertion of such liability cannot work an estoppel in this case and does not impose upon him any duty of consistency. Inasmuch as both the respondent's claims in the other proceedings and the claims by Mr. and Mrs. Fehrs are still to be adjudicated, it seems that the appropriate course for us is to disregard the positions taken by the parties in those proceedings and to adjudicate this case in accordance with the law and the facts presented to us. Our conclusions will no doubt be taken into consideration in the final adjudication of those other claims. Accordingly, we hold that section 304 is applicable to the petitioner's acquisition of the Rental stock.

In view of that conclusion, we now reach the question as to what was the petitioner's basis for the Rental stock under section 304. The petitioner must treat the stock as if it received the stock from the Fehrses as a contribution to its capital; therefore, the petitioner's basis equals the basis of the transferred stock in the hands of Mr. and Mrs. Fehrs plus the amount of gain, if any, which was recognized by Mr. and Mrs.Fehrs upon the transfer.[3] Secs. 304(a)(1)(B) and 362(a)(2); sec. 1.304–2(a), Income Tax Regs. It has been stipulated that the basis of the transferred stock in the hands of the Fehrses was zero, so the only remaining question in computing the petitioner's basis in such stock is with respect to the amount of the gain, if any, which Mr. and Mrs. Fehrs recognized upon the transfer. According to the income tax

---

[3] It has been suggested that the transfer of Rental stock by Mr. and Mrs. Fehrs might be treated, in part, as a redemption and, in part, as a gift to the shareholders of the petitioner. The issue of whether the transfer was, in part, a gift is not before us, and we cannot decide it because no evidence as to the value of the Rental stock has been presented. Solely for the purposes of this opinion, we shall treat the entire transfer as a redemption.

regulations, there is no step-up in the petitioner's basis if the redemption is treated as essentially equivalent to a dividend under section 302 and if the payments to Mr. and Mrs. Fehrs are taxable as a dividend under sections 302(d) and 301, but if the redemption qualifies as an exchange under section 302(b), the petitioner's basis is increased by the gain recognized by Mr. and Mrs. Fehrs. Sec. 1.304–2(c), examples (1) and (3), Income Tax Regs. The validity of such rules has not been challenged. Thus, to determine whether there is any step-up in the petitioner's basis in the stock, it becomes necessary to determine first whether the redemption is essentially equivalent to a dividend under section 302 or whether it qualifies as an exchange under such section.

Section 302 sets forth in subsection (b) the conditions under which a redemption of stock shall be treated as an exchange, and provides in subsection (d) that if those conditions are not met, then the distribution is one to which section 301 applies. If the redemption meets any one of the four tests set forth in section 302(b), it is treated as an exchange, and the amount of the distribution is treated as payment for the stock. Neither party argues the applicability of section 302(b)(2) or 302(b)(4) in this case, but the petitioner argues that the redemption should be treated as an exchange because it meets the test of either section 302(b)(1) or 302(b)(3). We shall consider each such test.

Section 302(b)(1) states, in effect, that the redemption shall be treated as an exchange if it "is not essentially equivalent to a dividend." To meet this test, a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation, after applying the attribution rules of section 318(a) to the stock ownership interests as they existed both before and after the redemption. Secs. 1.302–1(a), 1.302–2(b), Income Tax Regs.; *United States* v. *Davis*, 397 U.S. 301 (1970). Furthermore, in answering the question of dividend equivalence, it is irrelevant that the transaction in issue had a bona fide business purpose other than tax avoidance. *United States* v. *Davis, supra; Johnson* v. *United States*, 434 F. 2d 340 (C.A. 8, 1970); *Joseph Miele*, 56 T.C. 556, 567 (1971), on appeal (C.A. 3, Sept. 16, 1971); *Rose Ann Coates Trust, supra* at 514; *Ray A. Maher, supra* at 453.

After applying the attribution rules, Mr. and Mrs. Fehrs are considered as owning 98.2 percent of the outstanding shares of Rental— 1,355 out of 1,380—both immediately before and immediately after the redemption by the petitioner. We discussed previously the method of computing the preredemption figure; the postredemption figure is reached by attributing to the Fehrses the shares owned by the petitioner as well as those owned by their descendants. The latter result obtains from attributing the petitioner's 1,159 shares to Mmes.

Vlcek and May by virtue of section 318(a)(2)(C), the 50-percent requirement of which is not applicable here by reason of section 304(b)(1), and then attributing those shares in turn to the Fehrses under section 318(a)(1)(A)(ii).

The respondent contends that the correct comparison of the Fehrses' stock ownership before and after the redemption is to measure the percentage of the shares owned by them *immediately* before and *immediately* after the redemption; if such contention is accurate, it is clear that the Fehrses' stock ownership (as viewed through the prism of the attribution rules) was not changed at all by the redemption, and thus the redemption clearly fails to meet the test of section 302(b)(1) as articulated by the Supreme Court in *United States* v. *Davis, supra*, and as followed by this Court in the decisions previously cited.

On the other hand, the petitioner contends that the Fehrses' postredemption stock ownership should be measured as of the end of the series of transactions—that is, after the transfer of the stock by the petitioner to Rental, and after the cancellation of such stock by Rental. Because the number of outstanding shares of Rental was substantially reduced by the cancellation, the percentage of shares attributable to the Fehrses was also reduced; the reduction was due to the fact that the 25 shares owned by Mr. Vlcek (and consequently not attributable to the Fehrses) assumed a greater proportionate significance after the cancellation. However, even when measured in this way, the Fehrses are still considered to own 196 out of the 221 outstanding shares of Rental, or 88.69 percent of the total.

We need not pass upon the question of at which point in time the Fehrses' postredemption stock ownership should be measured, because we think that even if we adopt the view urged by the petitioner, and assume for the sake of argument that the redemption reduced the Fehrses' ownership interest from 98.2 percent to 88.69 percent, there still has not been "a *meaningful* reduction of the shareholder's proportionate interest in the corporation," as required by *United States* v. *Davis, supra* at 313. (Emphasis added.) A reduction in stock ownership from 98.2 to 88.69 percent does not deprive such a dominant shareholder of his ability to control the corporate activities; such a reduction does not affect the shareholder's relationship to the corporation in any significant way. See *Estate of William F. Runnels*, 54 T.C. 762, 766 (1970). Of course, the same percentage spread might make a great deal of difference if the initial figure was not such a very high one, and there might be unusual circumstances in which the exact percentage reduction here would be material. Yet, in the present case, we have been shown no reason to believe that an 88.69-percent

ownership interest in Rental would be less effective than a 98.2-percent interest. See *Friend* v. *United States*, 345 F. 2d 761, 764 (C.A. 1, 1965); *Bradbury* v. *Commissioner*, 298 F. 2d 111, 117 (C.A. 1, 1962). Moreover, the reduction that did occur resulted from a transfer of stock to the son-in-law of Mr. and Mrs. Fehrs, hardly a stranger to the family, and such transfer of ownership occurred because Mr. Fehrs made a gift of the stock to his son-in-law.

The petitioner advances other theories in support of its argument against dividend equivalence, but we do not find such theories to be helpful to its case. *Perry S. Lewis*, 47 T.C. 129 (1966), which was cited by the petitioner, was a case in which this Court held that payments made in exchange for a major shareholder's stock in a family-owned corporation were not essentially equivalent to a dividend. The majority opinion in *Lewis* stressed the existence of a business purpose for the redemption as an important factor in its decision; the petitioner argues the existence of a similar business purpose here, but such argument ignores the unambiguous langauge of the more recent Supreme Court opinion in *United States* v. *Davis, supra*, to the effect that such a business purpose is irrelevant for the purpose of determining dividend equivalance. See also *Joseph Miele, supra; Rose Ann Coates Trust, supra; Ray A. Maher, supra.*

The petitioner argues that the *Davis* decision is distinguishable and not applicable in this case. It points out that in *Davis*, the redemption resulted in no reduction of Mr. Davis' constructive ownership, and that Mr. Davis was in actual control both before and after the redemption; whereas in the present case, there may have been some slight change in Mr. Fehrs' constructive ownership, and Mr. Fehrs relinquished actual control. Despite these factual differences, we think that they lack legal significance. After reviewing the legislative history of section 302(b)(1), the Supreme Court concluded that Congress apparently had in mind a very limited purpose when it reinstated the dividend equivalency test in the 1954 Code; the Court pointed out that the provision was included to ease what would otherwise be the harsh result of section 302 " 'in the case of redemptions of preferred stock which might be called by the corporation without the shareholder having any control over when the redemption may take place.' " 397 U.S. at 310, citing S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 44 (1954); see also *John D. Gray*, 56 T.C. 1032, 1072 (1971). Here, Mr. Fehrs, like the petitioners in *John D. Gray*, was not the unwilling participant in the redemption, but was the guiding force behind it. The statements in an opinion must always be read with the facts of the case in mind. Yet, there is no indication that the Supreme Court intended for its opinion to be limited to the particular facts in the *Davis* case; on the contrary, its language is

sweeping. The Court clearly holds that whenever the dividend equivalency test of section 302(b)(1) is to be applied, business purpose is irrelevant.

The petitioner also argues that the attribution rules should be considered only for the purpose of "determining the ownership of stock," as prescribed by section 302(c)(1), but not for the purpose of determining control as part of a dividend equivalency test under section 302(b)(1); thus, the petitioner argues, we should take cognizance of the alleged fact that the redemption "eliminated the actual control of Edward J. Fehrs over the affairs of Fehrs Rental Co." However, in section 304, Congress expressly indicated that the attribution rules are to be applied in determining control. Section 304(a)(1) applies when one or more persons "control" each of two corporations; section 304(c)(1) defines control by stating that "control means the ownership" of stock possessing a specified percentage of voting rights or value; and section 304(c)(2) expressly provides, with one exception not here relevant, "Section 318(a) (relating to the constructive ownership of stock) shall apply for purposes of determining control under paragraph (1) [of section 304(c)]." The application of the attribution rules of section 318 to a redemption under section 304(a) can operate in such a way as to cause a person who actually owns no shares in a corporation to be treated as having 100-percent *control* of it. *Coyle* v. *United States*, 415 F. 2d 488, 490 (C.A. 4, 1968), reversing 268 F. Supp. 233 (S.D. W. Va. 1967). In *Coyle*, there is no indication that the taxpayer exercised actual control over the affairs of such corporation; the Fourth Circuit regarded the attribution rules alone as sufficient to impute complete control to him. This Court, too, has applied the attribution rules to determine who controlled a corporation involved in a redemption under section 304. *Ralph L. Humphrey*, *supra* at 205. See also Ringel, Surrey, & Warren, "Attribution of Stock Ownership in the Internal Revenue Code," 72 Harv. L. Rev. 209 (1958), in which the authors state in a context of discussing section 304, "The stock-attribution rules of section 318 apply to the determination of whether control exists * * *." 72 Harv. L. Rev. 226–227.

Similarly, it appears that when Congress provided that the attribution rules of section 318(a) are to be applied in determining the constructive ownership of stock for the purposes of section 302, it intended that a person who is deemed to be the constructive owner of the stock under such rules should be treated in all material respects as the actual owner of the stock, and as the possessor of all the usual incidents of ownership. See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 36 (1954). Probably the ability to control the corporation and guide its activities is

the single most significant element of stock ownership in the case of an approximately 90-percent interest in a closely held family corporation which does not regularly, if ever, pay dividends. We can perceive no reason why Congress would provide that Mr. Fehrs should be treated as the owner of such a substantial percentage of the stock of Rental unless he was also to be treated as being in a position to exercise the degree of control over such corporation as the owner of such a block of stock would ordinarily possess, and there is no authority to support such anomalous treatment. Indeed, in *United States* v. *Davis*, *supra*, in which dividend equivalence was the chief issue, the Supreme Court said of a taxpayer who actually owned only 250 out of the 1,000 shares of the outstanding stock of a corporation in which his wife and children owned the remaining stock, "After application of the stock ownership attribution rules, this case viewed most simply involves a sole stockholder who causes part of his shares to be redeemed by the corporation." 397 U.S. at 307. We think that the Supreme Court would not have applied the appellation "sole stockholder," with all of its connotations, to the taxpayer in *Davis* if it believed that he might not properly be regarded as controlling the shares attributed to him. Thus, insofar as it is relevant in determining the question of dividend equivalence in this case, we conclude that the attribution rules require that Mr. Fehrs must be treated as continuing in actual control of Rental after the transaction here in issue. *Levin* v. *Commissioner*, 385 F. 2d 521, 525 (C.A. 2, 1967), affirming 47 T.C. 258 (1966). We hold that the redemption cannot be treated as an exchange under section 302(b)(1).

The next question is whether section 302(b)(3) is applicable. Such section provides that the redemption is to be treated as an exchange "if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder." However, under section 302 (c)(1), the attribution rules of section 318 are applicable in determining whether a redemption has resulted in the complete termination of a shareholder's interest under section 302(b)(3), but section 302(c)(2) sets forth certain conditions under which the attribution rules are not applicable for such purposes. Obviously, Mr. and Mrs. Fehrs did actually transfer all of their stock in Rental, but whether the redemption can qualify under section 302(b)(3) depends upon whether the conditions of section 302(c)(2) have been met so that the attribution rules are not applicable.

Section 302(c)(2)(A) provides that, if all of three conditions specified in the statute are met, then the attribution rules are inapplicable with respect to a redemption which actually terminated the shareholder's interest within the meaning of section 302(b)(3). The three conditions are:

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary or his delegate by regulations prescribes, files an agreement to notify the Secretary or his delegate of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph.

Section 302(c) (2) (A) further provides that if the distributee acquires an interest other than that of a creditor, and other than an interest obtained by bequest or inheritance, in the corporation within 10 years from the date of the distribution, then the statute of limitations with respect to the assessment and collection of the tax due as a result of such acquisition of interest shall not expire until 1 year after the distributee notifies "the Secretary or his delegate" of such acquisition in conformity with the appropriate regulations.

With respect to the agreement described in section 302(c) (2) (A) (iii), the requirements are set out in greater detail in section 1.302–4 (a), Income Tax Regs.; in part, such regulations provide:

(a) The agreement specified in section 302(c)(2)(A)(iii) shall be in the form of a separate statement in duplicate signed by the distributee and attached to his return timely filed for the year in which the distribution described in section 302(b)(3) occurs. * * *

Mr. and Mrs. Fehrs did not file such an agreement with their income tax return for 1965, nor have they filed or attempted to file any such agreement since that time. Indeed, the petitioner admits the Fehrses' omission in this respect, but it argues that such omission should not serve to prevent the application of section 302(c) (2) (A). In making that argument, the petitioner relies on *Georgie S. Cary*, 41 T.C. 214 (1963) and cites also *Pearce* v. *United States*, 226 F. Supp. 702 (W.D. N.Y. 1964); and *Van Keppel* v. *United States*, 206 F. Supp. 42 (D. Kan. 1962), affd. 321 F. 2d 717 (C.A. 10, 1963).

In *Georgie S. Cary, supra*, all of the taxpayer's stock in a corporation was redeemed, but the remainder of the stock continued to be owned by her son. The taxpayer failed to attach the agreement required by section 302(c) (2) (A) (iii) to her Federal income tax return for the year of the redemption, but after the respondent commenced an audit of her return, she promptly filed an amended return for the year of the redemption, with the agreement attached. We held that the statutory provision pertaining to the filing of the agreement requires only substantial compliance, rather than strict compliance, and that substantial compliance was effected under the facts of that case. Similarly, the taxpayers in *Pearce* v. *United States, supra*, and *Van*

*Keppel* v. *United States, supra,* each substantially complied with the requirement of section 302(c)(2)(A)(iii) by filing (or attempting to file) the agreement upon discovering the inadvertent failure to do so earlier.

However, the facts of this case are significantly different from those in *Cary* and the other two cases. In the interest of justice, we concluded in *Cary* that substantial compliance was enough because it was sufficient to accomplish the legislative objective for requiring the agreement. To hold, as the petitioner urges, that section 302(c)(2)(A) is applicable even though an agreement has not been filed at any time would nullify the clear statutory provision requiring one to be filed. Congress considered that to carry out its legislative plan, an agreement must be filed by a shareholder whose stock is redeemed when the remaining stock is still owned by related parties. See S. Rept. No. 1622, *supra* at p. 236. We cannot ignore the express provisions of the statute. Accordingly, we hold that since the agreement required by section 302(c)(2)(A)(iii) has not been filed by Mr. and Mrs. Fehrs, the attribution rules of section 318 are applicable, and the redemption of their stock does not qualify as an exchange under section 302(b)(3).

For the foregoing reasons, the redemption in which the petitioner acquired the Rental stock from Mr. and Mrs. Fehrs does not qualify for treatment as an exchange under any of the provisions of section 302(b), and therefore, under section 302(d), the redemption shall be treated as a distribution of property governed by section 301.

Section 301(c)(1) provides in effect that, to the extent that it is made out of the corporation's earnings and profits, the distribution is treated as a dividend and is taxed as ordinary income to the recipient. Section 301(c)(2) goes on to provide that, to the extent that the distribution is not a dividend, it is first applied against the recipient's adjusted basis in the stock, and then, according to section 301(c)(3), the amount which exceeds such adjusted basis is treated as gain from the sale or exchange of property. The petitioner argues that, because it had no earnings and profits during its 1965 taxable year, the tax consequences to Mr. and Mrs. Fehrs of the annuity payments are governed by section 301(c)(2) and (3) and that the petitioner's basis in the stock acquired in the redemption should include, for purposes of computing its gain on the sale of the stock in 1965, the gains to be recognized in subsequent years by Mr. and Mrs. Fehrs as a result of the receipt of the annuity payments.

Initially, the respondent contends that there should be no increase in the petitioner's basis by reason of any gain recognized by the Fehrses under section 301. The respondent argues that section 362(a) provides for an increase in basis by reason of a gain recognized on the

transfer and that such language does not apply to gains recognized under section 301(c)(3). There is nothing in the statute or the legislative history to support such contention. The words of section 362(a) are clearly broad enough to apply to a gain recognized under section 301(c)(3), and accordingly, we reject such contention of the respondent.

The petitioner's argument that the annuity payments to Mr. and Mrs. Fehrs will be taxable, after recovery of basis, as a gain under section 301(c)(3) rests on the propositions that it had no earnings and profits in its 1965 taxable year and that the tax treatment of the payments that Mr. and Mrs. Fehrs will receive in later years is determined by its earnings and profits, or lack thereof, in 1965. The petitioner showed no earnings and profits in its books and records for 1965, but the respondent contends that its computations were incorrect for the reason that it recognized a gain on the sale of the Rental stock in that year and that such gain was erroneously omitted from its computation of earnings and profits. However, we would be required to determine the amount of the petitioner's earnings and profits in 1965 only if we conclude that the amount of, or the lack of, such earnings and profits governs the tax treatment of the property distributed to Mr. and Mrs. Fehrs. Thus, we must first decide what constituted the property distributed to the Fehrses, when the distribution or distributions occurred, and for what year or years the earnings and profits of the petitioner are determinative of the tax treatment of such property.

The petitioner argues that the making of the annuity contracts in 1965 constituted distributions of property under section 301, but we do not agree. The annuity agreements were simply promises to make payments to the Fehrses at a later time, contingent, of course, upon their surviving. The agreements provided unequivocally that they, and the payments to be made under them, could not be negotiated, assigned, or anticipated by the Fehrses, and that if the Fehrses did purport to make any such negotiation, assignment, or anticipation, the petitioner would be in no way obliged to recognize or give effect to it. Moreover, the petitioner, which was the obligor under the annuity agreements, was a new corporation with no substantial assets and no history indicating its financial reliability; the Fehrses' right to receive payments was no better secured than if the obligor were a private individual. Whatever the Fehrses may have considered the agreements to be worth to them, the agreements were in no way the equivalent of cash. Unlike the recipient of an ordinary promise to make a payment at a certain time in the future, the Fehrses did not receive anything in 1965 which they could have disposed of even at a substantial discount.

Leaving aside the question of the petitioner's ability to make the payments as they come due, it is true that a so-called actuarial value could be computed for the annuity agreements, but such value could not be realized by the Fehrses in 1965. No amount was recognizable by them in that year as a result of the receipt of the annuity agreements. *Commissioner* v. *Kann's Estate*, 174 F. 2d 357, 359 (C.A. 3, 1949), affirming a Memorandum Opinion of this Court; *Frank C. Deering*, 40 B.T.A. 984, 985–987 (1939); *J. Darsie Lloyd*, 33 B.T.A. 903, 905 (1936); *Hill's Estate* v. *Maloney*, 58 F. Supp. 164, 172 (D. N.J. 1944); see also *Glenn E. Edgar*, 56 T.C. 717, 742 fn. 15 (1971). The annuity agreements are similar in certain significant respects to the contract involved in *Allan S. Vinnell*, 52 T.C. 934 (1969), in which we held that the making of the contract did not constitute a distribution of property because of its contingent nature, so that the payment of each sum due under the contract constituted a separate distribution. In *Vinnell*, the shareholder's rights to the payments were subject to certain business contingencies, and his rights were expressly subordinated to the claims of a bank with which the corporation dealt. The occurrence of one of the contingencies would have resulted in the deferral or postponement or subordination of the payments, but in the present case, the occurrence of one certain contingency—the death of Mr. or Mrs. Fehrs—would terminate the obligation completely. Moreover, the corporate obligor in *Vinnell* had proven its viability as a business entity over a 14-year period, whereas the fledgling nature of the present petitioner created an additional contingency to undermine the certainty of the Fehrses' receiving the payments in the future. In *Thomas Kerr*, 38 T.C. 723 (1962), affd. 326 F. 2d 225 (C.A. 9, 1964), certiorari denied 377 U.S. 963 (1964); and *Rose Ann Coates Trust*, 55 T.C. 501 (1970), on appeal (C.A. 9, June 17, 1971), we held that the distribution of a corporate obligation constituted a distribution of property; but in those cases, the obligations were to pay fixed amounts over fixed periods of time, and those obligations had ascertainable fair market values. Thus, in this case, we reach the conclusion that no property distribution within the meaning of sections 301 and 317 was made in 1965.

Another argument advanced by the petitioner is that even if no distribution was made in 1965, the tax character of the annuity payments distributed in later years must be governed by the amount of the petitioner's earnings and profits—or the lack thereof—in the year 1965. The petitioner asserts that such argument is supported by *Samuel Goldwyn*, 9 T.C. 510 (1947), affd. 175 F. 2d 641 (C.A. 9, 1949). In *Goldwyn*, the corporation declared a dividend in fiscal 1931, and provided that such dividend should be payable on a certain date in that year. At the time of the declaration, the corporation debited (reduced)

its surplus account by the amount of the dividend, with the book entries indicating the amount which represented each shareholder's proportionate share of the dividend. At the time the dividend was declared, no cash payments were actually made to the shareholders in fiscal 1931 on account of the dividends declared. Such dividends were treated as a liability on the corporate books from the time of declaration. However, in fiscal 1933, the shareholders instructed the corporation to credit the amount of the dividend payable to each of them against amounts they owed the corporation, and the corporation did so, thus eliminating the dividends payable liability. Apparently, the shareholders reported the dividends as income for 1933.

The question presented to the Court in *Goldwyn* was whether the corporate actions in fiscal 1931 brought about a reduction of earnings and profits in that year. The Court held that the corporation had indeed reduced its earnings and profits in fiscal 1931, when it set aside a portion of its surplus to create a fixed liability to the shareholders. Such conclusion was reached without regard to the year in which the shareholders should have reported the dividends as income, but the Court added, as a second basis for its conclusion, that it was convinced that the shareholders had in fact constructively received the dividends in fiscal 1931, because the shareholders acquired in that year the ability to control completely the funds set aside for their benefit. The Ninth Circuit affirmed the decision of this Court on the ground that the amount of the corporate surplus was reduced in fiscal 1931, without considering the question of whether the shareholders constructively received the dividends in that year.

Even without regard to the constructive-receipt aspect of *Goldwyn*, we think that the case is factually distinguishable. In fiscal 1931, the corporation in *Goldwyn* undertook to segregate a portion of its earnings and profits as of that time; it actually set aside a specified amount out of its surplus on hand and created a fixed liability in such amount to the shareholders, with each shareholder's portion being designated. The shareholders' rights in their respective portions were such that two of the shareholders assigned part of their interests to another shareholder, and the corporation apparently gave full effect and recognition to such assignment. On the contrary, the petitioner here, when it entered into the annuity agreements, did not undertake to distribute earnings and profits as of 1965; it had no earnings and profits, current or accumulated, at the time of the making of the agreements. In fact, the petitioner did not set aside any specific presently existing sum of money, from whatsoever source, for the purpose of dedicating such sum to the satisfaction of the obligation to the Fehrses. Unlike the corporation in *Goldwyn*, when the petitioner in this case recorded the

annuity obligation as a liability on its books, it was simply recognizing its promise to make payments in the future.

In *Goldwyn*, we held that when a corporation takes the steps which the corporation in that case took to create a liability to pay dividends to its shareholders, and to dedicate a portion of its presently existing earnings and profits to the satisfaction of such liability, the actual distributions to the shareholders, whenever made, are considered to be made out of the earnings and profits which were dedicated to that purpose. From such holding, it does not follow that if a corporation, when it lacks earnings and profits, becomes obliged to make distributions to shareholders (which Mr. and Mrs. Fehrs are treated as for this, purpose) in future years, such distributions will be treated as if made when the corporation had no earnings and profits. The purposes of sections 301 and 316 would surely be violated if we were to hold that distributions made by a corporation to its shareholders out of earnings and profits could be treated as recoveries of basis or capital gains to the shareholders simply because the payments were made pursuant to the terms of an agreement entered into by the corporation in an earlier year when it had no earnings and profits. Accordingly, we reject the petitioner's argument that the tax treatment of the annuity payments which Mr. and Mrs. Fehrs receive in subsequent years is determined by the petitioner's apparent lack of earnings and profits in 1965. The taxability of such annuity payments will depend upon the circumstances existing in such later years.

Since no annuity payments were made to Mr. and Mrs. Fehrs in 1965, and since we have concluded that the making of the annuity contracts did not constitute a distribution of property to them in that year, no amount of gain was recognized by them in 1965 as a result of the transfer of their stock to the petitioner. The petitioner argues that its basis should include the amount of gains to be recognized by Mr. and Mrs. Fehrs in subsequent years. Although there may be circumstances in which the acquiring corporation's basis in property should take into consideration the gains to be recognized by the transferors in later years—a question which we need not and do not decide—it seems clear that such a prediction of future gains could be appropriate only when there is a reasonably reliable method for ascertaining the amount of such gains. Here, it is utterly impossible to anticipate the amount of gains to be recognized in the future. By use of actuarial tables, the amounts of the annuity payments that Mr. and Mrs. Fehrs will receive, if they live out their life expectancies, can be estimated, but it is impossible to forecast whether such payments will be treated as dividends under section 301(c)(1) or as gains under section 301(c)(3). According to its books and records, the petitioner showed substantial deficits for the years 1966, 1967, and 1968, but the respondent has raised sev-

eral serious objections to the petitioner's method of computing its earnings and profits for those years. Irrespective of who is right as to those years, there is no certainty that the petitioner will operate at a loss in subsequent years during the lifetimes of Mr. and Mrs. Fehrs. In any year in which it earns profits, the payments to Mr. and Mrs. Fehrs would probably be considered as dividends under section 301(c)(1). In view of this uncertainty, there is no satisfactory method of anticipating the amounts that will be recognized as gains under section 301(c)(3) by Mr. and Mrs. Fehrs. Thus, we conclude that the petitioner's basis in 1965 must be limited to any gain recognized by the transferors in that year; that is, zero. It will be necessary to postpone to 1966 and subsequent years any adjustment in the petitioner's basis in the Rental stock to reflect any gains recognized under section 301(c)(3) by Mr. and Mrs. Fehrs. Accordingly, we hold that in 1965, the petitioner's basis for the purpose of computing its gain on the sale of the Rental stock must be zero, and it must recognize as a gain the entire payment which it received in that year.

In seeking the answers to the questions in this case, we searched the legislative history of section 304. The Advisory Group, created by the Ways and Means Committee to study the provisions of subchapter C of the Code (secs. 301 *et seq.*) and make recommendations with respect to such provisions, was of the opinion that the provisions as enacted do not carry out the purpose of the section, and the Advisory Group recognized the need for statutory changes. Revised Report of the Advisory Group on Subchapter C to the Committee on Ways and Means, p. 12 (Dec. 11, 1958). See also Supplemental Statement of the American Bar Association, Section of Taxation, filed with the Senate Finance Committee in connection with hearings on H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 343, 353 (1954); First Report on H.R. 8300 of the Association of the Bar of the City of New York, Committee on Taxation, *ibid* at 504, 520; Statement on behalf of Empire State Chamber of Commerce, Albany, N.Y., with respect to H.R. 8300, *ibid* at 2075, 2080. The changes recommended by the Advisory Group have not been made, and we must interpret the statute as it was enacted and remained in effect for the years in issue in this case. Here, we do not have statutory provisions that are general and ambiguous as to how they are to be applied to the particular facts of the case before us. Compare *International Trading Co.*, 57 T.C. 455 (1971). Here, the statutory provisions are specific and set forth clearly the legislative purpose. Under these circumstances, there is no doubt as to what was intended by the Congress, and we have applied those provisions as intended. If the results do not carry out the underlying purposes of section 304, as suggested by the Advisory

Group, it will then be necessary for the Congress to take up the matter and make any changes in the statute which it considers appropriate.

To reflect the respondent's concession that the petitioner's gain in 1965 should be treated as long-term capital gain,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

———

TANNENWALD, *J.*, concurring: I fully agree with Judge Simpson's comprehensive analysis and append these additional comments only for the purpose of making clear the precise scope of our decision.

First, this case concerns the basis provisions of section 362(a)(2). Its rationale may not be equally applicable, in other circumstances, to the determination of basis of property acquired in exchange of an annuity.[1] See *John C. W. Dix*, 46 T.C. 796 (1966), affirmed on other issues 392 F. 2d 313 (C.A. 4, 1968); Rev. Rul. 69–74, 1969–1 C.B. 43; Rev. Rul. 55–119, 1955–1 C.B. 352. See also *Peter Vaira*, 52 T.C. 986, 996–998 (1969), remanded on other grounds 444 F. 2d 770 (C.A. 3, 1971).

Second, our opinion should in no way be taken as an expression of our views as to whether, in another context, e.g., the taxability of transferor shareholders, we would not, under the circumstances herein, look through the initial acquisition and treat the transaction as in substance a redemption by the corporation whose stock was acquired and simultaneously redeemed. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

DRENNEN, RAUM, and IRWIN, *JJ.*, agree with this concurring opinion.

———

QUEALY, *J.*, concurring: I am compelled to concur in this decision because of the manner in which the issues were presented. However, as pointed out by Judge Tannenwald in his concurring opinion, there is serious question whether the Court should not look to the real nature of the transaction. What we may really have here is a sale of stock by Mr. Fehrs to his various relatives, the consideration to be paid out of the future earnings of the corporation. See *Casner* v. *Commissioner*, 450 F. 2d 379 (C.A. 5, 1971).

DRENNEN, *J.*, agrees with this concurring opinion.

———

[1] We note that the general provision stating that "The basis of property shall be the cost of such property" specifically excepts from its operation the provisions of subch. C, which includes sec. 362. See sec. 1012.