WILLIAM D. GARDNER and JUANITA GARDNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gardner v. Commissioner
Docket No. 9188-73.
United States Tax Court
T.C. Memo 1976-349; 1976 Tax Ct. Memo LEXIS 54; 35 T.C.M. (CCH) 1592; T.C.M. (RIA) 760349; November 16, 1976, Filed William E. Scent,Michael J. Clare, and David W. Gray, for the petitioners. Jack A. Joynt, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of petitioners William D. Gardner and Juanita Gardner in the amount of $10,922.15 for the calendar year 1970. The issues for decision are (1) whether amounts paid *55 in 1970 by the corporation of which one of petitioners was controlling stockholder were payments in satisfaction of an obligation of that petitioner thereby constituting dividend income to petitioners under sections 301 and 316, I.R.C. 1954, [1] and (2) whether the value of the use of automobiles owned and maintained by the corporation and used by petitioners and their dependent son during 1970 constitutes dividend income to petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. William D. Gardner and Juanita Gardner, husband and wife, who resided in Mayfield, Kentucky at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1970 with the District Director of Internal Revenue at Louisville, Kentucky. During 1970 Mr. Gardner (petitioner) was president of Dan Gardner Ford, Inc. of Mayfield, Kentucky, a new and used car dealership. In January 1967 petitioner became aware that the owner of the Ford Motor Company dealership in Mayfield, Kentucky had died. Petitioner was desirous of acquiring *56 the dealership but did not have the necessary funds available. He filed an application for financial help in the acquisition of the agency through the Dealer Development program offered by Ford Motor Company (Ford) with the district office of Ford in Louisville, Kentucky. Under its Dealer Development programs Ford advances a portion of the capital needed by a prospective dealer to begin operation in return for part ownership of the dealership. Petitioner negotiated for approximately 3 months with Ford before being informed that funds would not be made available under the Dealer Development program. Petitioner was advised by Ford to seek an alternative means to raise sufficient money to acquire the dealership. Petitioner contacted his brother who agreed to advance $19,200 of the amount needed for initial capitalization of a corporation to acquire the dealership. Petitioner's brother, James K. Gardner, was the owner of a Ford dealership in Michigan. Petitioner and his brother approached Ford Motor Credit Company in an attempt to borrow the additional funds needed to meet capitalization requirements for a dealership. Ford Motor Credit Company agreed to advance the necessary funds, *57 but would not approve petitioner's brother as a co-owner of the franchise because his Michigan dealership at the time had an outstanding loan with Ford Motor Credit Company. Ford Motor Credit Company also questioned whether the franchise would support more than one equity owner. The brothers then agreed that James Gardner would advance the $19,200 to petitioner in return for a promissory note which would be repaid in stock when the loan with Ford Motor Credit Company was paid. Ford would approve petitioner's acquisition of the dealership only if he could raise total capital of $107,264, which amount was considered adequate for the purchase of the asserts of the dealership from the previous owner's widow and initial working capital. Ford Motor Credit Company agreed to make a loan of $50,000 for acquisition of the dealership if both petitioner and his brother signed the note and all the stock of the corporation to be formed to operate the dealership was pledged as collateral for the loan. In June 1970, James Gardner determined that he was not able to raise the $19,200 which he had agreed to advance for acquisition of the dealership. Petitioner and his brother then contacted *58 Robert Ray to determine whether he would be interested in advancing the $19,200 that James Gardner could not raise. Mr. Ray was interested and agreed to advance the money. Pursuant to discussions with respect to the proposed advance of a sum of money by Mr. Ray, petitioner, his brother James, and Mr. Ray entered into the following "Memorandum of Agreement" drafted by Mr. Ray's attorney: THIS AGREEMENT MADE AND ENTERED INTO, this 24th day of JUNE, A.D. 1967, at Pt. Huron, Michigan, by and between WILLIAM D. GARDNER, of Pt. Huron and being the First Party, and ROBERT RAY of * * * Detroit, Michigan, and being the Second Party, and JAMES K. GARDNER, of Pt. Huron and being the Third Party; WITNESSETH: That Whereas the said ROBERT RAY has this date made a loan OF @NINETEEN THOUSAND TWO HUNDRED ($19,200.00) DOLLARS to the said WILLIAM D. GARDNER, through the said JAMES K. GARDNER, who was acting as the intermediary. And Whereas the said WILLIAM D. GARDNER has this date executed a promissory note for the repayment of said loan of NINETEEN THOUSAND TWO HUNDRED ($19,200.00) DOLLARS to JAMES K. GARDNER, who thereupon assigned all his right, title and interest in the aforesaidnote [sic] *59 to ROBERT RAY, the actual lendor in fact. IT IS UNDERSTOOD AND AGREED BETWEEN THE PARTIES HERETO, That in Consideration of this loan, the funds of which will be used by the said WILLIAM D. GARDNER, in the operation of this automobile business under the name of DAN GARDNER FORD, INC., at Mayfield, Kentucky, the said WILLIAM D. GARDNER, agrees to pay the said note when it becomes due, to the said ROBERT RAY, and to pay to him the equivalent of $19,200.00 in such a number of shares of stock of the DAN GARDNER FORD, INC., the value of said shares totalling $19,200.00 and being based on the book value of said shares at the time the said DAN GARDNER FORD, INC. agency commences business. The above shares of stock will be traferred and assigned by the said WILLIAM D. GARDNER to the said ROBERT RAY, at such time when the aforementioned note becomes due and payable, to wit: Within thirty (30) days after the DAN GARDNER FORD, INC. agency repays its loan to the Ford Motor Credit Company. * * *
Petitioner on June 24, 1967, executed a promissory note to James K. Gardner which provided as follows: , WILLIAM D. GARDNER, promise to pay to the order of JAMES K. GARDNER, the sum of NINETEEN *60 THOUSAND TWO HUNDRED and no/100ths ($19,200.00) DOLLARS, with interest thereon, or on any unpaid portion thereof, at the rate of Six (6) Per Cent, per annum; Said note being due, and payable in full, within thirty (30) days after the automobile agency of DAN GARDNER FORD, INC. repays its loan to the Ford Motor Credit Company. The makers, indorsers and guqrantors hereof waive presentment, demand of payment, notice of non-payment, protest, notice of protest and all exemptions. * * *
James K. Gardner assigned this promissory note the Robert Ray on the same date on which it was executed. Although the agreement of June 24, 1967 provided that Mr. Ray was to advance $19,200 with petitioner raising the balance to reach the required $57,264, petitioner was able to raise only approximately $33,000. Petitioner then requested Mr. Ray to advance an additional $5,000, which Mr. Ray agreed to do, receiving in return a promissory note from petitioner dated June 29, 1967. Mr. Ray advanced a total of $24,200 by drawing or causing to be drawn his personal check dated June 29, 1967, payable to W. D. Gardner in the amount of $12,162.71; a money order dated June 29, 1967, payable to W. *61 D. Gardner in the amount of $9,771.43; and a cashier's check dated June 26, 1967, payable to W. D. Gardner in the amount of $2,265.86. Petitioner on July 1, 1967, opened a personal account and an account for DanGardner Ford, Inc. with the First National Bank, Mayfield, Kentucky.On that same date petitioner deposited the checks and the money order received from Mr. Ray along with other funds, making a total of $55,818 in his personal account in the First National Bank. He then drew a check on his personal account payable to Dan Gardner Ford, Inc. in the amount of $55,264 which was deposited to the account of the corporation in the First National Bank. On June 3, 1967, Ford had approved the transfer of the dealership, to be effective July 1, 1967, to a corporation to be organized under the laws of the State of Kentucky. Dan Gardner Ford, Inc. was created on July 1, 1967 and petitioner began doing business on that date. The articles of incorporation of Dan Gardner Ford, Inc. provided that its authorized stock was 1,000 shares of common stock. At the time Dan Gardner Ford, Inc. was created, Ford Motor Credit Company stipulated that there would be only one owner of the agency. On *62 July 12, 1967, the 1,000 shares of stock of Dan Gardner Ford, Inc. were issued to petitioner by Certificate No. 1. On the following day the 1,000 shares of stock represented by Certificate No. 1 were pledged to Ford Motor Credit Company as security for the $50,000 loan. On the same date James K. Gardner executed an agreement which provided in part: TO FORD MOTOR CREDIT COMPANY: For a good and valuable consideration, the receipt and sufficiency of which is each hereby acknowledged, and to induce you to make advances under your Wholesale Plan to, and to purchase or otherwise acquire retail instalment contracts under your Retail Plan from, or to otherwise extend credit to: Dan Gardner Ford-Mercury, Inc. (hereinafter called the "Dealer") * * * * * *
Each of the undersigned creditors represents and warrants that the Dealer is presently indebted to such creditor as follows only: Creditor
Amount
Due Date
Collateral Security
James K. Gardner
$19,200.00
---
None
In August 1967 Mr. Ray moved from Michigan to Mayfield, Kentucky to begin working at the dealership in the capacity of vice president and used car manager. As a corporate officer, Mr. *63 Ray was authorized to sign checks drawn on the corporate account and was given a set of keys to the business and the combination of the company safe. Mr. Ray was also a director of the corporation. In August 1968 the loan with Ford Motor Credit Company was paid in full by Dan Gardner Ford, Inc. Approximately $40,000 of the funds used to repay the loan were borrowed from a local bank. The 1,000 shares of stock previously pledged with Ford Motor Credit Company were in turn pledged with the bank in Mayfield as collateral for the loan. On the date the loan was obtained from the bank in Mayfield, the net worth of Dan Gardner Ford, Inc. was approximately $73,000. In January 1970 Mr. Ray decided that he wanted to terminate the agreement with petitioner because he was dissatisfied with the operation of the company. Mr. Ray, after consulting with his wife and his attorney, decided that $38,000 would be a proper amount to release petitioner from the agreement. On Saturday, January 24, 1970, Mr. Ray discussed with Mr. Gardner the fact that he was not satisfied and wanted the money returned that he had advanced to Mr. Gardner under the contract dated June 24, 1967, and the promissory *64 note dated June 29, 1967. On Monday, Mr. Gardner checked with a local bank and determined that the bank would loan the corporation a sufficient amount to pay to Mr. Ray the $38,000. On January 28, 1970, Dan Gardner Ford, Inc. issued a check payable to Mr. Ray in the amount of $38,000. Upon receipt of the check, Mr. Ray executed a receipt and release of the note signed by petitioner and payable to James K. Gardner in the sum of $19,200 dated June 24, 1967, and also released petitioner from any and all obligations under the memorandum of agreement executed on June 24, 1967. In addition, the note in the amount of $5,000 dated June 29, 1967, was marked "paid." Mr. Ray was not issued stock in the corporation. Subsequent to January 28, 1970, Mr. Ray remained with the dealership for several months in the capacity of a salesman. On its corporate income tax returns for 1970, Dan Gardner Ford, Inc. treated the $38,000 paid to Mr. Ray as a purchase of treasury stock. The return also reflected petitioner as the sole shareholder of Dan Gardner Ford, Inc. During the year 1970, Dan Gardner Ford, Inc. furnished Mr. and Mrs. Gardner with the use of an automobile. Mr. Gardner was employed *65 by the corporation as president and Mrs. Gardner as secretary and business manager. The corporation furnished them with an automobile for the entire year. The automobile used by petitioners was a demonstrator that would be used by petitioners until sold to a customer of Dan Gardner Ford, Inc. When the demonstrator that had been assigned to them was sold, the corporation would furnish them with another demonstrator so that during the year petitioners were furnished with a total of three different automobiles from the current year's inventory. [2] The cars were used to drive to and from work and also for any other driving of a personal nature as the Gardners did not personally own an automobile. During the workday the car was at the dealership and was available for use by the salesmen for demonstration purposes. Petitioner's son, Dan *66 Gardner, Jr., was also furnished an automobile beginning in April of 1970 when he received his driver's permit. Dan, Jr. worked part-time at the dealership after school and on weekends in the capacity as a salesman and also ran errands for other employees of the business. During the 9 months he was licensed to drive, he was also furnished with three different automobiles consisting of demonstrator models from the current year's inventory.[3] He used the automobiles furnished to him to drive to and from school and work, and for all other social activities normally associated with a 16-year-old individual. On petitioners' income tax return for 1970, Dan, Jr. was claimed as a dependent. All maintenance and operation expenses of each of the automobiles furnished to the Gardners were paid for by the corporation. The corporation sold each of the automobiles at a profit after it had been used for a short period of time. The corporation *67 did not depreciate the automobiles that were demonstrators. Respondent in the statutory notice of deficiency mailed to petitioners determined that the payments made to Robert Ray and the furnishing of automobiles by the corporation for the personal use of petitioners and their son represented dividend income to petitioners in the total amount of $42,700. Respondent included this amount in petitioners' gross income with the following explanation: During the taxable year 1970, Dan Gardner Ford, Inc., made certain payments for your benefit and permitted you to use corporate property without compensation. It is determined that such items comprise dividend income under Sections 301 and 316 of the Internal Revenue Code and are includable in your gross income in the following amount: Obligations paid by Dan Gardner
Ford, Inc.
$38,000.00
Dan Gardner Ford, Inc., automobiles
used by your family with fair
rental value of $400.00 per month
($400.00 X 12)
4,800.00
Total dividend
$42,800.00
Less: $100.00 exclusion
100.00
Adjustment
$42,700.00
OPINION Petitioners contend that the payment of $38,000 by Dan Gardner Ford, Inc. to Robert Ray was made in satisfaction *68 of an obligation of the corporation and not in satisfaction of an obligation of petitioner. Petitioners primary position is that the $38,000 was paid by the corporation in redemption of Mr. Ray's interest as a shareholder in the corporation. They argue that Mr. Ray acquired a shareholder's interest in the corporation by virtue of the agreement reached between petitioner and Mr. Ray in June 1967. Petitioners contend that in June 1967 petitioner was acting as a promoter for a corporation not yet formed and that the agreement reached with Mr. Ray was in effect a subscription by Mr. Ray for stock in the corporation based upon a "condition subsequent." Petitioners state that the condition to the issuance of stock was the repayment of the note to to Ford Motor Credit Company. petitioners' argument is that the advance of $24,200 made by Mr. Ray was an advance of capital to the corporation through petitioner. Petitioners also take the position that regardless of the labels given to the agreement between petitioner, Mr. Ray and petitioner's brother, the substance of the transaction was that Mr. Ray purchased stock in the corporation even though the form in which the transaction was *69 cast was that of a loan. It is respondent's position that the agreement of June 24, 1967, between petitioner and Mr. Ray provided for a loan by Mr. Ray to petitioner as an individual and required petitioner to transfer stock of the corporation to Mr. Ray. Respondent takes the position that the $5,000 loan made by Mr. Ray was a loan to petitioner as an individual. It is respondent's position that the corporation was not a party to the agreement and was not legally bound by the agreement. Respondent contends that the payment by the corporation relieved petitioner of a personal obligation to Mr. Ray and therefore resulted in a constructive dividend to petitioner in the amount of the payment. If we agree with petitioners that the $38,000 paid by the corporation to Mr. Ray was a redemption in complete termination of Mr. Ray's shareholder's interest in the corporation, there is no constructive dividend to petitioner resulting from the fact that he became the sole shareholder in Dan Gardner Ford, Inc. Milton Priester,38 T.C. 316, 326-327 (1962). However, if we determine that the payment to Mr. Ray of $38,000 by the corporation was in satisfaction of an obligation *70 solely of petitioner's with no expectation of repayment to the corporation of the amount so advanced, it follows that the corporation has conferred an economic benefit on petitioner comparable to a cash distribution by the corporation to its stockholder resulting in a dividend to petitioner subject to the provisions of section 301(c). United States v. Smith,418 F.2d 589, 593 (5th Cir. 1969); Sullivan v. United States,363 F.2d 724, 728 (8th Cir. 1966); and Sachs v. Commissioner,277 F.2d 879, 882-883 (8th Cir. 1960), affirming 32 T.C. 815 (1959). Kentucky law in effect at the time of the agreement of June 24, 1967, was entered into provided that "(1) [subscriptions] for shares of a corporation to be formed shall be in writing." [4] Petitioner cites us to no case where an agreement comparable to that of June 24, 1967, here involved has been construed to be a stock subscription agreement and our research has found none. We note that the agreement before us makes no mention of a subscription for stock nor does it contain any reference to the usual terms found within a stock subscription agreement such as anticipated *71 total capitalization, number of shares to be issued or subscribed, price per share, par value or a contemplated date of incorporation. Petitioners argue that the form of the agreement was due to the fact that it was reached prior to the incorporation of Dan Gardner Ford, Inc. at a time when there was no corporate entity with a capacity to contract. However, where a subscription agreement has been entered into prior to the issuance of the articles of incorporation, in order for the agreement to be binding on the corporation, the contract should be expressly or implicitly ratified by the corporation subsequent to the issuance of the articles of incorporation. There is no indication any such action was taken or contemplated by Dan Gardner Ford, Inc. In our view the record does not support petitioners' argument. *72 Petitioners also take the position that the substance of the transaction between petitioner and Mr. Ray as distinguished from its form places an obligation on the corporation to issue stock to Mr. Ray for his advance of capital of $19,200 to be used in the corporate business. Petitioners argue that the agreement between petitioner and his brother was that petitioner's brother would lend the corporation $19,200 and would receive stock from the corporation for this advance when the corporate indebtedness to Ford Motor Credit Company had been paid. Petitioners contend that when petitioner's brother was unable to raise the $19,200 to go through with his agreement, Mr. Ray merely took over his agreement. However, the record does not support petitioners' contention. The record shows that Mr. Ray expected petitioner to repay him the $19,200 and $5,000 loans personally. In addition, Mr. Ray expected to get some stock in the corporation. It is not clear from whom Mr. Ray expected to receive stock of Dan Gardner Ford, Inc. The agreement says that petitioner agrees to pay the $19,200 note when it becomes due and "to pay to him [Mr. Ray] the equivalent of $19,200.00 in * * * shares of *73 stock of the DAN GARDNER FORD, Inc., * * *." All of the stock of the corporation was issued to petitioner. In this state of the record, petitioner has failed to show that he did not have a personal obligation to transfer some of his stock in Dan Gardner Ford, Inc. to Mr. Ray. On the basis of this record, we agree with respondent that the sums advanced by Mr. Ray, though to be used in the dealership business, were to be repaid by petitioner pursuant to contractual arrangement made between petitioner and Mr. Ray in their individual capacities. Since petitioner was issued all the stock of Dan Gardner Ford, Inc. and testified that it was not planned for the corporation to issue more stock, this record does not support petitioner's contention that the agreement of June 24, 1967, in substance contemplated that stock would be issued to Mr. Ray by the corporation. Rather, the other facts in the record tend to support the view that the intent as well as formal wording of the agreement was that petitioner would "pay" some of his stock to Mr. Ray. Therefore, the $38,000 payment by the corporation was of a personal obligation of petitioner and results in a constructive dividend to him. *74 Petitioners have relied on Fox v. Harrison,145 F.2d 521 (7th Cir. 1944), to support their contention that the substance of the agreement rather than its words should control. The facts in that case are totally different from those in the instant case. In an effort to come within the factual situation involved in Fox v. Harrison,supra, petitioners argue that regardless of the words of the agreement the intent of the parties was that the corporation was to issue stock to Mr. Ray upon the retirement of the note with Ford Motor Credit Company.They state that at that time the limitation of one equity owner would no longer be applicable. Petitioners assert that the promissory notes were merely issued as a guaranty or indemnity. However, the facts in this record do not support petitioners' contentions. The actions taken by the parties with respect to the note are consistent with the words of the agreement. Also, Mr. Ray testified that he considered petitioner personally indebted to him on the two notes. The agreement drafted by an attorney on behalf of Mr. Ray was captioned as a loan and a promissory note in the amount provided for in *75 the agreement was executed. Also, a promissory note was executed in the principal amount of $5,000 in consideration of the advance of June 29, 1967. When the prohibition of one equity owner was removed by retirement of the note with Ford Motor Credit Company, petitioner continued to hold all authorized and issued shares of the corporation. Petitioners argue that this retention of ownership of the shares by petitioner was necessary because the stock was pledged for a bank loan. However, they offer no explanation of why part of the stock could not have been issued to Mr. Ray and both stockholders pledge their stock with the bank. In January 1970 when Mr. Ray received $38,000 by a check drawn on the account of Dan Gardner Ford, Inc., he executed a release to petitioner from the obligation of the June 24, 1967, agreement with no mention of the corporation included in the release. [5] Also, both promissory notes were marked "paid." The agreement reached by the parties was the result of a conversation on the Saturday prior to the payment of the $38,000 on Wednesday, January 28, 1970. Although petitioner has urged that this transaction was a redemption of stock, there is no indication *76 that the corporation took any formal action with respect to this transaction. In our view, the agreement by its terms and the action of the parties subsequent to June 24, 1967, were consistent with a loan from Mr. Ray to petitioner personally, and we so hold. Therefore, the payment of $38,000 by the corporation conferred an economic benefit upon petitioner by relieving *77 him of the obligation of the agreement of June 24, 1967, and the note executed on June 29, 1967, without expectation of repayment. This conferring of an economic benefit on petitioner gives rise to a constructive dividend to petitioner in the amount of the payment. [6]
It is petitioners' position that the use of the demonstrator automobiles by petitioners and their dependent son did not result in a constructive dividend to petitioners because their personal *78 use of the automobiles was incidental to their business use. In the alternative petitioners contend that if the furnishing of an automobile gives rise to taxable income, the nature of the income is additional compensation because each car was furnished ude to the fact of their employment. Therefore, under petitioners' contention there would be no constructive dividend to petitioners for the value of any of the automobiles furnished. It is respondent's position that the fair market value of the personal use of the automobiles furnished to petitioners and their son by the corporation in which petitioner is controlling shareholder and president constitutes a constructive dividend to petitioners. [7]
*79 It is well settled that when corporate property is used by a shareholder or a member of his family and the use of such property is not proximately related to corporate business, the fair rental value of such property is includable in the stockholder's income. Challenge Manufacturing Co.,37 T.C. 650, 663 (1962). See also Commissioner v. Riss,374 F.2d 161, 166-167, 170 (8th Cir. 1967), affirming a Memorandum Opinion of this Court on this issue, but reversing and remanding on other issues; Motel Company v. Commissioner,340 F.2d 445, 448-449 (2d Cir. 1965), affirming a Memorandum Opinion of this Court; Estate of William F. Runnels,54 T.C. 762, 767 e81970). Petitioners' initial contention is that the personal use of the automobiles was merely incidental to business use. This contention has no merit. For the year in issue petitioners did not own a personal automobile. All personal driving done by petitioners, including commuting to and from work, vacations, trips to church and stores, and trips to visit their relatives, was done in new automobiles furnished to them by the corporation. In addition, Dan, Jr. *80 , used a new car provided by the corporation to travel to and from work and school and for any other personal driving that an individual his age would normally do. It is clear that the personal use of the automobiles was not merely incidental. Petitioners' alternative argument that the amount includable in their income should be treated as additional compensation and not as a constructive dividend is also without merit. [8] Since petitioners' income would be increased by the same amount, whether the value of their personal use of the automobiles furnished to them is considered dividend income or compensation, this argument is apparently directed to inclusion in petitioners' income of the value of the automobiles furnished to their son. Petitioners have the burden of proof of showing that the use of the cars for personal purposes was intended as additional compensation. Motel Company v. Commissioner,supra at 449; *81 Challenge Manufacturing Co.,supra. Petitioners have argued that the use of the automobiles furnished to them and their son was the same as other salesmen employees and therefore the use was provided with respect to their employment and not through petitioner's status as a shareholder. However, the only evidence in the record is petitioner's statement to this effect. There is nothing to indicate how many salesmen were furnished automobiles, whether the cars furnished to salesmen could be kept by them on the weekend for personal use or used on personal vacations, or if Dan Gardner Ford, Inc. paid for all upkeep and maintenance on those cars. [9]
Petitioner testified that the automobiles assigned to petitioners and their son by the corporation were used by other salesmen during the workday for demonstration purposes or to attend to other corporate business, but there is no indication of the extent or frequency of such use.The only evidence offered by petitioners to show that the value of the use of the automobiles *82 by them was worth any lesser amount than that reflected by respondent in his notice of deficiency was petitioner's statement that he felt the personal use of the automobiles was approximately 20 percent of the total use based upon the fact that he had only 20 percent of the day remaining after completing work. This evidence is insufficient to show that the value of the use of the automobiles was any less $200than per month for each automobile.
Petitioner testified that Dan, Jr. was allowed the use of an automobile from April to December 1970. In our view the record is reasonably clear that the amount of $4,800, included in the notice of deficiency as dividend income to petitioners for the personal use of corporate automobiles, was based upon a computation $200of per automobile per month. Also, the record shows that Dan, Jr., did not have a driver's permit until April of 1970. We conclude that the evidence is sufficient to show that Dan, Jr., did not have an automobile assigned to him for more than 9 months of the year 1970. On the basis of the record as a whole, we conclude that respondent has overstated the amount of the dividend income to petitioners from their personal use *83 of automobiles furnished to them by the corporation by $600 and hold that the proper amount of such dividend income is $4,200. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The automobiles furnished were a 1970 Ford LTD Broughan with a suggested retail price in excess of $5,000, a 1970 4-door LTD with a suggested retail price in excess of $4,800, and a 1971 2-door LTD Broughan with a suggested retail price in excess of $5,000. Each car was driven by petitioners for approximately 4 months before being replaced.↩
3. The automobiles furnished were a 1970 Ford Mustang with a suggested retail price in excess of $3,800, a 1970 4-door LTD with a suggested retail price in excess of $4,600, and a 1971 Mustang with a suggested retail price in excess of $4,200.↩
4. Ky. Rev. Stat. sec. 271.075 (1946), repealed by Kentucky House Bill 178, sec. 165, in 1972. The statute in effect in 1967 provided: 271.075 Subscriptions for shares before incorporation. (1) Subscriptions for shares of a corporation to be formed shall be in writing. Unless otherwise provided in the writing, a subscription shall be: (a) Irrevocable for a period of one year from the date of signing except as provided in subsection (2) of this section; (b) Revocable after a period of one year from the date of signing, unless prior to such revocation a certificate of incorporation has been issued as provided in KRS 271.055. (2) Subscription for shares may be revoked at any time by either party upon such grounds as exist at law or in equity for the rescission of any contract. (3) Upon the issue of the certificate of incorporation, subscriptions for shares may be enforced by the corporation according to their terms unless revoked as provided in this section. (4) When no provision as to the time of payment is made in the contract of subscription, shares shall be paid for on the call of the board of directors.↩
5. Petitioner has placed emphasis on the manner in which Mr. Ray reported the receipt of the $38,000 on his 1970 Federal income tax return. Mr. Ray reported a long-term capital gain of $13,800 based upon the receipt of $33,000 under the agreement with a basis of $19,200. The gain was characterized on the return as the gain from the sale of 192 shares of stock. The additional $5,000 was treated as repayment of the $5,000 loan of June 29, 1967. Mr. Ray's return was examined by an agent of respondent and the return was accepted as filed. Although the treatment on Mr. Ray's return and the resulting acceptance of the return are irrelevant to the issue of this case, we note that the agent's report noted the amount of gain to be a release of Mr. Gardner by Mr. Ray from the contract of June 24, 1967, to receive stock.↩
6. Petitioners have argued on brief that if we find the agreement between petitioner and Mr. Ray created a loan, then petitioners should be entitled to a deduction for interest paid in the amount of $13,800 -- the amount in excess of the principal amounts reflected on the promissory notes. The $19,200 note provided for payment of interest. For this reason, it cannot be assumed that the transfer of stock provided for in the same contract as the $19,200 loan was intended as interest. There is no evidence to indicate that any of the amount paid to Mr. Ray was interest on the notes. The payment of the principal amounts and consideration for the release to provide stock appear to encompass the total of $38,000 paid to Mr. Ray.↩
7. On brief respondent has made statements that the amount includable in petitioners' gross income based on the free use of the automobiles is an amount higher than that determined in the statutory notice of deficiency. Respondent makes such statement based upon his interpretation of petitioner's testimony concerning the value of the use of the automobiles. Although it is not clear that respondent is attempting by these statements to claim an increased deficiency, suffice it to say that, if this is the purpose, this is neither a proper nor timely manner to make such a claim. Also, the record is reasonably clear that the amount of the $4,800 dividend as determined by respondent was for the personal part of the use of the automobiles. Work papers of respondent's agent which were received in evidence stated in this respect: "The Gardner family keeps two inventory autos for their personal and business use. All operating expenses are charged to Dan Gardner Ford, Inc. Per CRR 1964-26 I am proposing a dividend of $200 a month for each auto including operating expenses. The operating expenses were not disallowed to the corporation because they would be nominal and the time to find them would not be warranted." The record is reasonably clear that these work papers of the agent formed the basis of the notice of deficiency.↩
8. Petitioners have relied on Lang Chevrolet Co.,T.C. Memo. 1967-212. This case is distinguishable on its facts from the case before us. See Footnote 2 in the case of Whipple Chrysler-Plymouth,T.C. Memo. 1972-55↩.
9. We note that no amount was included by petitioners in gross income on their tax return as compensation representing the use of the automobiles.↩