GLENN W. TURNER AND ALICE A. TURNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Turner v. Commissioner
Docket No. 7786-73.
United States Tax Court
T.C. Memo 1985-159; 1985 Tax Ct. Memo LEXIS 466; 49 T.C.M. (CCH) 1107; T.C.M. (RIA) 85159; April 2, 1985. Roger v. Barth and Paul S. Richter, for the petitioners. Thomas R. Ascher, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1969
$264,792.97
$13,239.65
1970
$123,278.81
$ 6,163.94
1971
$496,671.35
$24,833.57
After concessions by respondent, [1] the issues for decision are as follows: 1. Whether petitioner Glenn W. Turner received constructive dividends from his wholly owned corporations, Koscot Interplanetary, Inc., and subsidiaries, as succeeded in reorganization by Glenn W. Turner Enterprises, Inc., and subsidiaries in the amounts and years as *467 determined by respondent and set forth below: (a) $271,486.07, $53,553.66, and $105,042.51 for the years 1969, 1970, and 1971, respectively, based on advances to or for Glenn W. Turner's behalf by Koscot Interplanetary, Inc., as reflected in Koscot Account No. X1-425 "Advances to Glenn W. Turner"; (b) $73,945.77, $19,730.39, and $10,213.70 for the years 1969, 1970, and 1971, respectively, based on certain credits to Glenn W. Turner's Koscot advance account determined by respondent to be either unsubstantiated or personal expenses of Turner's and not properly chargeable to Koscot business expense; (c) $4,600 and $8,500 for 1971 based on advances to or for Glenn W. Turner's behalf from Koscot subsidiaries, Intercontinental Credit Rating Corp. and American Line Cosmetics, Inc., respectively; (d) $87,755.50 and $520,568.83 for 1970 and 1971, respectively, based on amounts expended by Koscot for the acquisition of and construction on a tract of land referred to as the "castle property"; (2) Whether petitioners had unreported income in the amount of $296,677.20 for 1971 consisting of bank deposits to a certain Florida National Bank checking account referred to as the "G.W.T. Land *468 Account"; and (3) Whether, if we find that petitioners underpaid their taxes for any of the years at issue, the underpayment is due to petitioners' negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). [2]
FINDINGS OF FACT General Facts
At the time they filed their petition in this case, petitioners' legal residence was Rural Route 1, Bear Gully Road, Maitland, Florida. Petitioners Glenn W. Turner (Glenn) and Alice A. Turner Flynn (Alice) were married during 1969, 1970, and 1971, and filed joint Federal income tax returns for those years; they were subsequently divorced on February 9, 1979. Glenn's Work History and Formation of Koscot Interplanetary, *469 Inc.
Glenn, born in Columbia, South Carolina, in 1934, dropped out of school in the eighth grade at age 17. He then joined the U.S. Air Force, but received a medical discharge for a perforated ear drum at age 18. After leaving the Air Force, Glenn attended an adult education school for one year and then went on to a junior college and trade school. During the period from 1954 to 1966, Glenn performed various jobs. In 1954, at the age of 20, he went to work for Monarch Sewing Center in Greenville, Souch Carolina, as a door-to-door sewing machine salesman. Unsuccessful and discouraged by this venture, Glenn then performed a series of jobs. He pumped gas, did odd jobs, worked as a carpenter, worked in the Civil Service at an air base, and returned home to help his father with the family farm. After failing once at an attempt to start his own business, in 1966, Glenn became a partner in a distributorship for Holiday Magic, a California cosmetics company. Successful at this cosmetics venture, Glenn formed his own company on August 22, 1967, Koscot Interplanetary, Inc. (Koscot), in Orlando, Florida, to set up a network of cosmetics distributorships. From the time of Koscot's *470 formation in 1967 until July 31, 1971, Glenn was its sole stockholder. During the period 1969 through 1971, Glenn was Koscot's chairman of the board; he resigned as chairman in early 1972. Koscot formed a number of subsidiaries including among others, House of Koscot, which set up cosmetics boutique shops; American Line Cosmetics, set up for over-the-counter cosmetics sales; ServKot, a credit card corporation; Dixie Harvesting, a fruit-harvesting company; and Dare To Be Great, which sponsored sales motivational courses for Koscot distributors and salespeople. Koscot and its subsidiaries operated and reported their income on a July 31 fiscal year during the years 1967 through 1971. Koscot and its subsidiaries grew rapidly during the period 1969-1971, with total sales of $13 million for 1969, $22 million for 1970, and $56 million in 1971. By 1971, Koscot had over 400 employees at the main corporate headquarters in Orlando, Florida, and 100 more employees in other parts of the country. Koscot also had subsidiaries operating in other countries, including Australia, Spain, Mexico, Venezuela, Canada, England, and Germany. As Koscot's chairman of the board, Glenn was responsible *471 for giving training lectures, motivational and sales talks to Koscot distributors, potential distributors, and people working in various Koscot offices. During the period 1969-1971, Glenn traveled for Koscot a great deal; flying in Koscot's Lear jet, he "hit three states a day, four days a week * * * 16 to 18 hours a day * * * just a hectic schedule." Glenn usually spent one day per week at the office in Orlando and maybe one day with his family. On August 1, 1971, there was a reorganization of Koscot's corporate structure. Koscot and its subsidiaries and certain of its affiliates became the subsidiaries of one of Koscot's former subsidiaries, Glenn W. Turner Enterprises, Inc. (Turner Enterprises). Glenn became the sole shareholder of Turner Enterprises which in turn was the sole shareholder of Koscot. Prior to 1973, neither Koscot nor Turner Enterprises ever declared a dividend. The Advance Account
During 1969, 1970, and 1971, the years at issue, partly as a result of Glenn's frenetic business travel schedule, substantial amounts of Koscot funds were used to pay certain personel expenses for Glenn and his family. In addition, Koscot funds were advanced to Glenn so he *472 could purchase various parcels of real property for investment purposes. Brent Wright (Wright), Koscot's first accountant, explained to Glenn, and Glenn agreed, that all such expenditures made on Glenn's behalf by Koscot which could not be properly classified as legitimate business expenses would have to be charged to Glenn as advances, i.e., loans, which Glenn would have to repay. Koscot's accounting department kept a detailed record of all advances to Glenn in Koscot's Account No. X1-425, designated "Advances to Glen [sic] W. Turner," (the advance account) so that Glenn could repay all such amounts. At some time after 1969, Koscot hired Gordon Simonds (Simonds), a tax attorney, with whom Glenn also discussed his advances from Koscot. Simonds directed Glenn to execute interest-bearing promissory notes to reflect the advances from Koscot. It was always Simonds, and personnel from the Koscot accounting department, which by 1971 had over 60 employees including bookkeepers and several certified public accountants, not Glenn, who determined which Koscot expenditures should be charged to Glenn's advance account and which others were properly chargeable to business expense. Periodically, *473 adjusting entries were made to the advance account to reflect the proper bookkeeping treatment of items debited to the advance account; some items initially debited to the advance account were credited thereto and redebited to other business expense accounts when it was determined by Simonds or the bookkeeping department that such expenditures were actually Koscot business expenses rather than Glenn's personal expenses. The yearend balances of Glenn's advance account were shown as "Loans to stockholders," i.e., corporate assets, on the balance sheet submitted as part of Koscot's corporate Federal income tax returns for fiscal years ended July 31, 1969, 1970, and 1971 in the respective amounts of $469,249, $638,486, and $348,645. Similarly, the yearend balances of Glenn's advance account were shown as corporate assets designated "Due from officer" on Koscot financial statements for 1969, 1970, and 1971 in the respective amounts of $469,249, $638,486, and $372,645. Interest on Glenn's promissory notes was accrued in Koscot's account No. X1-515 designated "Accrued Interest on Bonds and CD's." Attached to Koscot's Consolidated Financial Report for the fiscal year ended July 31, 1969, is *474 Note 6 which states the following: NOTE 6 - Due from Officer
This amount [$468,249] is due from Glenn W. Turner, Chairman of the Board. At the date of this report, the Company held mortgages from Mr. Turner on property owned by him as follows: a first mortgage of $160,000 on a residence which cost $160,000; second mortgages of $85,000 on real estate which cost $206,600 and is subject to first mortgages of $127,600. Attached to Koscot's consolidated financial statements for the fiscal year ended July 31, 1970, "prepared in conformity with principles of accounting applicable to a going concern" as affirmed by J.K. Lasser & Company (J.K. Lasser), a public accounting firm, is Note 5 which states: Note 5. DUE FROM OFFICER The amount of $638,486 is due from Mr. Glenn W. Turner, Chairman of the Board. At July 31, 1970, the company holds notes and mortgages on property owned by Mr. Turner as follows: A first mortgage of $160,000 on a residence which cost $160,000; second mortgages of $85,000 on real estate which cost $206,000, and is subject to first mortgages of approximately $120,000. Unsecured promissory notes of $225,000 which bear interest at the rate of 5 percent *475 per annum. Mr. Turner is currently in the process of conveying to the company title to assets which the company estimates to have a value of $410,000, in partial payment of this loan. Attached to J. K. Lasser's Auditors' Report concerning Koscot's financial statements for the fiscal year ended July 31, 1971, is Note 8 which states: NOTE 8 DUE FROM OFFICER The amount of $372,645 is due from Mr. Glenn W. Turner, Chairman of the Board, and represents notes and open accounts due. At July 31, 1971, the company holds unsecured notes from Mr. Turner of $225,000 which bear interest at the rate of 5 percent per annum. Also the company holds a second mortgage of $15,000 which bears interest at 6 percent collateralized by real estate owned by Mr. Turner. At the time Koscot made the advances to Glenn, he intended, and believed that he had the financial ability, to repay them in full to Koscot. Glenn's belief that he had the financial ability to repay the advances stemmed from the fact that in Glenn's opinion, Koscot was fast growing into a successful company; in 1969 Koscot's sales hit $13 million and in 1970 he was offered $20 million to sell Koscot. Glenn, thus thought at the time *476 that he was the sole owner of a very financially successful venture, the equity of which he could draw upon to more than repay the amounts he owed to Koscot. Glenn did repay a portion of the advances. He authorized the personnel of the Koscot accounting department to withhold amounts from his salary to be applied against amounts he had been advanced; a review of the advance account records indicates that repayments from Glenn's salary were credited to the advance account on several occasions. In November 1970, on the advice of Simonds, his tax attorney, Glenn conveyed real estate, consisting of nine properties with a net value of $405,868, to Koscot, which was credited to his advance account in reduction of the balance due in the account. [3] On September 30, 1971, the account was credited in the amount of $10,213.70 to reflect Glenn's constribution to Koscot of a 1971 Cadillac El Dorado, purchased by Glenn and used by Alice for a short time, which was later awarded to a Koscot distributor as a promotional prize. Glenn's Financial Reverses
*477 Beginning in the Fall of 1972, events occurred which had a direct, adverse financial impact on both Turner Enterprises and Glenn himself as its sole stockholder. In September 1972, a U.S. District Court in Oregon enjoined a major part of the operations of Dare To Be Great, a subsidiary of Turner Enterprises, for violations of Federal securities laws. Not only did Turner Enterprises incur substantial legal expenses in connection with this litigation, the injunction significantly effected a reduction in the earnings of Dare To Be Great from which "it never did recuperate." In addition, in mid-May 1973, Turner Enterprises, along with Koscot, Dare To Be Great, Glenn, and nine other individuals were indicted by the United States on 27 counts of mail fraud and one count of conspiracy. The trial commenced in September 1973 in Jacksonville, Florida, and continued uninterrupted, but for the Christmas holidays, for 9 months, ending in a mistrial. Glenn was later indicted again on approximately half of the original mail fraud charges and was tried in Tampa, Florida. By the time of the second mail fraud trial, Glenn was forced to proceed without an attorney and defend himself due to lack *478 of funds. After a 9-week trial, Glenn settled with the Government by pleading guilty to reduced charges for which he received a sentence of one year unsupervised probation and a $5,000 fine. The result of the protracted litigation and prosecutions described above was the virtual financial collapse of Turner Enterprises. Turner Enterprises' officials, in Glenn's words, "were tied up in the Courts for approximately two years * * * and they didn't know how to run the company without the officials." Koscot, by mid-1973, was in "bad shape"; it was overdrawn at the bank, had no sales to speak of, and the Internal Revenue Service had seized the Koscot building in Orlando, Florida. Turner Enterprises sold all of its Koscot stock in 1973 to Max Morris (Morris), a Baptist minister, in satisfaction of $15,000 in fees, earned by Morris for consulting services performed by him for Koscot, which Koscot was unable to pay. Facing a major criminal prosecution at the time, Glenn decided to sell Koscot to Morris because he felt that he did not have the time to "save" it. On July 2, 1973, soon after its sale, Koscot filed a petition for reorganization under chapter 11 of the Bankruptcy Code. *479 The petition reflected the amount of $376,000, the balance of Glenn's advance account at the time, as due and owing to Koscot from Glenn. Glenn discussed his advance account with Koscot's new owners and agreed that he would have to pay the balance owed. The new owners tried to collect on the balance, but were unsuccessful; Glenn had been rendered "broke" by his prosecutions, events which occurred after 1971. In a sworn Financial Disclosure Report filed with the State of Florida in November 1978 in connection with his candidacy for public office, Glenn stated that he owed Koscot $365,000. As of the date of trial, to Glenn's knowledge, Koscot had not forgiven any of the amounts advanced to Glenn. The Castle Property
In 1969, Glenn and his family moved to a residence at 155 Oakleigh Lane in Maitland, Florida (the Oakliegh Lane property). It was a "large house, built mostly for entertainment," by its former owner, a telephone company executive. The Oakleigh Lane property was purchased by Koscot for Glenn because, as Koscot was growing, he had been looking for a house in which he could entertain Koscot employees and distributors in a more "personal" and impressive setting. *480 Glenn and Alice did a lot of entertaining on behalf of Koscot at the Oakleigh Lane property at least once a week, sometimes two or three times a week. At times, as many as 300 people connected with Koscot would come to the Oakleigh Lane house to be trained or participate in Glenn's motivation courses. The neighbors began complaining about the crowds and the buses which brought the people to the Oakeigh Lane property. Thus, Koscot officials decided to acquire a piece of land outside of town on which company people could more easily be accommodated. In December 1970, Koscot purchased approximately 60 acres of raw land on Bear Gully Lake in Seminole County, Florida (the castle property). At the time of the purchase, there were no improvements on the land, just woods and lowlands on the lake. Construction was started on the castle property soon after its purchase. Even before there were habitable structures on the property, however, the castle property was used as a place for Koscot business meetings and programs. Koscot produced a motivational film showing Glenn walking on the land to demonstrate to Koscot distributors that if they worked hard, they too could own their own *481 land. Koscot bought a tour boat for the lake and company officials would bring people out to the property, take them on boat tours, have a picnic and conduct sales meetings. Attending these sales meetings were Koscot distributors from such countries as Venezuela, Germany, and Australia in numbers as great as 600 at a time. The following structures were constructed by Koscot Interplanetary Construction Company, a Koscot subsidiary, on the castle property which was named "The Village of Anything is Possible:" The stables. Downstairs in the stables were unfinished horse stalls. Upstairs there was a 3-bedroom, 2-bath apartment intended as a caretaker's residence. The boathouse. Downstairs in the boathouse were 3 boat stalls and a small 2-bedroom apartment intended for out-of-town corporate visitors. Upstairs there was a "round rotunda" room approximately 50 feet in diameter with a hooded fireplace in the middle, a wet bar, and 2 bathrooms intended for entertaining the large groups of people who came to the property for Koscot sales and training meetings. The castle. This was the main building on the property and, although never completed, was intended by Glenn and other Koscot *482 officials to serve a dual purpose: (1) it was to be the personal residence for Glenn and his family, and (2) it was to serve as a corporate facility for sales and training meetings, and for entertaining the hundreds of Koscot officials and distributors, from the United States and all over the world, who were expected to visit the castle property. As it was planned, [4] the main castle building was to have 42 rooms, covering over 50,000 square feet of floor space, in 4 floors. The castle contained living space for Glenn and his family, [5] but was also designed to house facilities for training, meetings, and entertainment, which could accommodate large groups of people, such as a beauty and barber shop, a theater, music room, business den, conference rooms, lounge, steam bath, dressing rooms, and a meat locker. In general, Glenn thought the impressive castle property spread would ultimately enhance Koscot's success by demonstrating to Koscot employees and distributors that if they worked hard, as had Glenn, they too could rise from nothing, as had Glenn, to live in such a place. *483 Although it was used for corporate business and entertainment purposes from the time of its purchase in 1970, there were no habitable structures on the castle property in 1970 or 1971. Sometime in the Spring of 1972, Glenn and his family moved to the caretaker's apartment in the stables building, the first of the structures on the castle property to be completed. By that time, Glenn had resigned as Koscot's chairman of the board and had been replaced as chairman by Hobart Wilder (Wilder). Petitioners moved out of the Oakleigh Lane property and into the stables at the castle property so that Wilder and his family could move into the Oakleigh Lane property. As Koscot's new chairman, Wilder needed a place to entertain; the castle property was not yet ready for inside entertainment. At the time, Glenn thought the castle would be completed in 3 or 4 months. As of the time of trial, however, the castle building had not been completed, was never habitable, and had never been lived in by petitioners or anyone else. After petitioners moved to the castle property, Koscot continued to use it for corporate business purposes. As described by Alice, there were "throngs of people all the *484 time" who had been bussed in to visit the castle property. Alice felt as though she "lived in a glass cage" at the castle property because there were people "everywhere all the time" and she had no privacy and no life of her own outside of the Koscot business of her husband. In 1970 and 1971, Glenn had no intention of owning the castle property; he could not afford the property taxes. In August 1972, however, with Turner Enterprises beginning to collapse financially because of the litigation and prosecutions described above, Glenn purchased the castle property from Koscot, assuming an existing first mortgage in the original principal amount of $213,000 and giving Koscot a second mortgage in the original principal amount of $379,600. On August 30, 1972, Glenn executed and filed a declaration of homestead with Seminole County, Florida, to protect the castle property from creditors. As of the date of trial, Glenn and Alice still owned the castle property. The G.W.T. Land Account
On July 26, 1971, Glenn opened checking account no. XXX-428-F designated "G.W.T. Land Account" (the Land Account) at the Florida National Bank with an initial deposit of $266,934. The address given *485 by Glenn for this account was his personal residence at Oakleigh Lane. Glenn opened this account to solve a difficult personnel problem which was causing tension between two individuals in upper management and threatened to disrupt the operation of the company. By mid-1971, Glenn's chief assistant, Ben U. Bunting (Bunting), was not working hard enough. Wilder, who was working is some undesignated position under Bunting, began to resent the fact that he was working 18-hour days and Bunting was not carrying his weight. Glenn determined to replace Bunting with Wilder, but he was afraid that Bunting, who had a loyal following at Koscot, could "split the company." Thus, Glenn wanted as set up a land corporation to be headed by Bunting as a subsidiary of Turner Enterprises in order to make Bunting useful again and give him the impression that he was being promoted. Wilder, however, did not want to go along with this idea, so Glenn set up the land account in his own name and address, using Turner Enterprises funds, and concealing it from Wilder until he had "smoothed the feathers" of both Bunting and Wilder. When Glenn proposed the land corporation idea to Bunting, however, Bunting *486 informed Glenn that he wanted to start his own company and that he wanted a consulting contract from Turner Enterprises. Although he had some reservations about this demand, Glenn used the money in the land account to lend Bunting the funds which enabled Bunting to buy Candida Holdings, N.V., a company incorporated in the Netherlands Antilles. On August 24, 1971, Glenn drew two checks on the Land Account, one payable to Candida Holding, N.V. [sic] in the amount of $30,000, and the other payable to Ben U. Bunting in the amount of $220,000. On August 18, 1972, Bunting and Glenn entered into a Memorandum of Agreement indicating that on September 30, 1971, Bunting signed a note promising to pay Glenn the sum of $200,000 plus 4 percent annual interest on or before March 1, 1982, and promising to place in escrow such number of Candida Holdings shares which would have a value equal to 125 percent of the note. All of this was done by Glenn on behalf of Turner Enterprises in his individual capacity as described by Glenn: It was to keep Mr. Wilder from objecting to giving Mr. Bunting the money to start his own company, because he felt like that Bunting hadn't earned it and wasn't earning *487 it and there was a possibility he would have caused a lot of problems or quit and he [Wilder] was our key money maker. So, we had it done to keep peace until things simmered down. * * * I just did it through me on behalf of the company. Glenn turned Bunting's note over to Turner Enterprises. Corporate records concerning the Land Account were misplaced during the Grand Jury investigation of Turner Enterprises. Petitioner's Tax Returns for 1969, 1970, and 1971
In their joint Federal income tax returns for the calendar years 1969, 1970, and 1971, petitioners reported income in the form of wages received by Glenn from Koscot and Turner Enterprises in the respective amounts of $90,000, $68,000, and $294,615. Petitioners did not report as income any amounts advanced to Glenn and reflected in his Koscot advance account or amounts advanced by any other of his corporations for those years. Petitioners' tax returns for the years at issue were prepared by the Koscot accounting department in cooperation with Simonds, Koscot's and Glenn's personal tax attorney and J. K. Lasser, the public accounting firm which audited Koscot's books. Glenn gave them the authority to prepare his *488 personal income tax returns because he "didn't know how to do things like that." Glenn assumed that they were doing things "like it was supposed to be done." Koscot's Tax Returns for FYE 7/31/69, 7/31/70, and 7/31/71
In its consolidated income tax returns for fiscal years ended July 31, 1969, 1970, and 1971, Koscot reported taxable income and retained earnings as follows: FYE
Taxable Income
Retained Earnings
7/31/69
$1,544,794 $ 810,591 7/31/70
$ (955,207)
$ (248,096)
7/31/71
$ 609,824 $ (387,126)
OPINION 1. Constructive Dividend Issues
A. Advance Account Balances
The first issue is whether the net increases in Glenn's Koscot advance account for the years at issue are constructive dividends, and thus taxable as ordinary income, as determined by respondent, or bona fide, nontaxable loans, as petitioners here contend. This is a factual question and depends upon the existence of an intent on Glenn's part to repay the advances at the time they were made, and the intent to Koscot's part to enforce the obligations. Pierce v. Commissioner,61 T.C. 424, 430 (1974). Thus, resolution of the issue turns upon *489 a consideration of all the facts and circumstances. Roschuni v. Commissioner,29 T.C. 1193, 1201-1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959). After careful consideration of the facts on this issue, we conclude that Glenn intended to repay the amounts advanced to him by Koscot and that Koscot intended to enforce Glenn's obligations. Concerning Glenn's intent to repay the advances, Glenn testified at trial that he was informed by Koscot's bookkeeper, and he agreed, that all amounts advanced by Koscot for his personal expenses would have to be reimbursed; that he authorized Koscot's bookkeeping personnel to credit his salary to the advance account; that, as security for the advances, he gave interest-bearing notes and real estate mortgages to Koscot; and that he believed he had the financial ability at the time to repay the advances in full because Koscot was so financially successful. We found Glenn on this issue to be a credible witness, whose credibility was unimpeached by respondent, and we accept his testimony as proof of his intent to repay the advances. Further, his testimony is corroborated by certain documentary evidence described *490 in our findings above. A review of the advance account for the years at issue reveals that it was credited on several occasions for repayments from Glenn's salary. Explanatory notes to Koscot's financial statements for the 3 years at issue, two of which were prepared by J. K. Lasser, a public accounting firm, reflect that Glenn had given security for the advances in the form of real estate mortgages and interest-bearing notes. A financial statement filed by Glenn in 1978 reflects the amount due to Koscot from Glenn. All of this documentary evidence, in our view, corroborates Glenn's testimony and independently reflects his intent to repay the advances. We also think the evidence clearly reveals Koscot's intent to enforce Glenn's obligation to repay the advance account. All decisions concerning which amounts were to be included in the advance account were made, without interference by Glenn, by either Koscot's bookkeepers or Simonds, its tax attorney, and reviewed by J. K. Lasser, the independent auditors. All amounts advanced and repaid were carefully compiled and fully detailed in Koscot's account no. X1-425 designated "Advances to Glen [sic] W. Turner." Such amounts were *491 not deducted by Koscot as business expenses, but rather were consistently reported for financial and income tax accounting purposes as receivables "Due From Officer," i.e., corporate assets in the form of loans to Glenn. Koscot accrued interest on the note given by Glenn for these advances in its account no. X5-515 designated "Accrued Interest on Bonds and CD's." Simonds, Koscot's tax attorney, recommended that Glenn execute an interest-bearing promissory note for the amount of a portion of the advances, and that he convey property valued at over $405,000 in repayment of the advances. After Koscot was sold to a third party in 1973 and filed a chapter 11 petition in bankruptcy, the petition reflected the amounts due from Glenn, efforts were made by Koscot's new owners to collect them, and such amounts have never been forgiven as far as Glenn in aware. All of these facts demonstrate that Koscot personnel, independently of Glenn, were keeping track of amounts advanced to Glenn so that Glenn could repay them and Koscot could enforce his obligations. When viewed in its totality, the arrangement was not used as a method of siphoning off Koscot's earnings. We conclude there was a genuine *492 intent on the part of both Glenn and Koscot to create a genuine debt which would be repaid. Respondent contends that Glenn could never have had the requisite intent to repay the advances because he could have never hoped to repay the advances given the fact that his income and other assets were not great enough to draw on to satisfy the debt. We accept Glenn's testimony that he believed he had the financial ability to repay the advances based on his equity interest in Koscot, a company which, during the 3 years at issue, was growing spectacularly. The fact that Turner Enterprises, and as a result, Glenn himself, suffered severe financial reverses in later years in no way detracts from Glenn's intent, at the time the advances were made, to repay them, or his subjective belief that he had the financial ability to pay them. Thus, we conclude that the amounts advanced to Koscot to Glenn during the years at issue as reflected in his advance account do not constitute constructive dividends to him, but rather are nontaxable loans. As such, they are not includable in petitioners' income for the years at issue. B. Credits to Advance Accounts
For 1969, 1970, and 1971, each *493 of the years at issue, respondent determined that certain specific amounts ($73,945.77, $19,730.39, and $10,213.70, respectively) credited to Glenn's Koscot advance account and redebited to other Koscot business expense accounts were either personal expenses of Glenn's or unsubstantiated by him. Petitioners, who have the burden of proof of this issue, Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), presented no evidence concerning respondent's adjustments for 1969 and 1970. On brief, petitioners state as follows: While petitioners have proven that all of these classifications were performed in good faith by competent professional staff and approved by independent auditors and tax counsel and thus are correct, petitioners would submit that the details concerning these various items really make no difference in the context of this case. * * * [T]o the extent the Court might find any of these disputed items to be improper as a corporate expense item, the proper treatment should be to re-debit the particular item to Koscot Account No. X1-425. Such treatment does not result in any "constructive dividend" income to petitioners as * * * Glenn Turner has acknowledged *494 his obligation to repay Koscot the amounts he has owed it as is properly reflected in Koscot's Account No. X1-425. We do not think we are obliged to accept the amounts reclassified to Koscot business expense as properly chargeable thereto merely on a showing by petitioners that the reclassifications were made by competent tax experts. Without some evidence from petitioners concerning the purposes for which the expenditures were made, we have no basis for deciding whether they were business or personal expenses. Further, we do not agree that the "proper treatment" for these items would be to redebit them to Glenn's advance account and therefore hold them to be nontaxable loans based on our conclusion above concerning the advance account. Glenn's testimony and petitioners' other evidence with respect to the advance account are relevant only to items actually contained therein. It was those items which, as we have concluded above, Glenn agreed to repay and the repayment of which Koscot agreed to enforce. Petitioners have made no showing that either Glenn or Koscot ever agreed that any of the amounts credited to the advance account and redebited to business expense were bona fide *495 loans. Indeed, Glenn's and Koscot's intent that such amounts would be loans is implicitly negated by Koscot's decision to redebit the items to business expense and Glenn's acquiescence in the redibiting. We are, therefore, constrained to sustain respondent's determination in this regard for 1969 and 1970; petitioners have failed to carry their burden of proof. [6]
We reach a different conclusion, however, with respect to 1971. In that year, as indicated above in our findings, Koscot credited Glenn's advance account by $10,213.70, the price of a 1971 Cadillac El Dorado, and redebited the amount to Koscot business expense. Respondent determined that petitioners had not substantiated business use of the car and, therefore, charged petitioners with a constructive dividend in the amount of the credit to the advance account. Based on the testimony of Glenn and Alice, both of whom we found to be credible witnesses on this issue, we are satisfied that although Alice used the Cadillac for a short period of time during 1971, the car was in fact *496 given away as a prize to a Koscot distributor for promotional purposes. Under these circumstances, we think the credit to Glenn's advance account and the redebit to business expense were proper and we hold for petitioners on this issue for 1971. C. Advances by Intercontinental Credit Rating Corp. and American Line Cosmetics, Inc.
Respondent determined that Glenn received constructive dividends in 1971 from Intercontinental Credit Rating Corp. and American Line Cosmetics, Inc., subsidiaries of Turner Enterprises, as a result of advances to his account in the respective amounts of $4,600 and $8,500. Based on the almost complete lack of evidence produced by petitioners on this issue, on which, again, they bear the burden of proof, we sustain respondent's determination. In their reply brief, petitioners contend that because Koscot's corporate income tax return for the fiscal year ended July 31, 1971, prepared by J. K. Lasser, C.P.A.s, expressly reflect these two items as "Due From Officers" in the schedule of assets for the consolidated subsidiaries of Koscot; because Koscot's books were kept in accordance with generally accepted accounting principles; and because of the *497 "general tenor of Turner's testimony concerning the loans and advances in Koscot Account No. X1-425," they have produced evidence adequate to carry their burden of proving that the advances from the two Koscot subsidiaries were loans. We do not agree. Merely because petitioners consider these two adjustments to be "deminimus in the context of this case," they cannot be excused from proving the essential fact of an agreement between Glenn and the two subsidiaries that the advances were bona fide loans which Glenn intended to repay and the subsidiaries intended to collect. The characterization of these advances cannot ride the coattails of those contained in Glenn's Koscot advance account. A mere bookkeeping entry together with a suggested inference to be drawn from the "general tenor" of Glenn's testimony are not sufficient to prove the required intent. D. The Castle Property
Respondent determined that petitioners received constructive dividends from Koscot in 1970 and 1971 based on incremental costs incurred by Koscot for the purchase of and construction of the buildings located on the castle property. Petitioners first contend that in pressing the constructive *498 dividend claim with respect to the castle property for 1970 and 1971, respondent is attempting to tax them twice for the same items.Petitioners assert that, in a notice of deficiency issued September 2, 1977 for their 1972 taxable year, respondent included $608,323.83, the sum of $87,755 and $520,568.83, the same amounts determined as constructive dividends for 1970 and 1971 here at issue, as part of a total constructive dividend of $1,910,042.65 with respect to the castle property for 1972; that their 1972 taxable year was the subject of a separate Tax Court case, Docket No. 11895-77; and that, in settling that case prior to trial in the instant matter by a stipulated decision entered January 3, 1984, petitioners, with the exception of additions to tax for fraud conceded by respondent, conceded all income adjustments determined by respondent which included the full constructive dividend of $1,910,042.65 determined for 1972 involving Koscot's costs associated with the castle property for 1970 through 1972. Thus, because their 1972 taxable year has been "conclusively settled and respondent has obtained an assessment for the same items here involved," petitioners contend that respondent *499 is foreclosed from asserting his "alternative position" for 1970 and 1971 which would result in a double inclusion of the castle property constructive dividend in their income. In his reply brief, respondent states the following: The respondent agrees that the respondent's determination for 1972 with respect to the amount of the constructive dividends received by the petitioners as a result of the construction of the castle property is excessive and contained a duplication of the amount of the dividends asserted to have been received by the petitioners during the taxable years 1970 and 1971. * * * Respondent, however, merely concedes a computational error for 1972 in the amount of $608,323.83, while continuing to contend that that amount is properly taxable to petitioners as constructive dividends during 1970 and 1971 as the sum of amounts expended by Koscot during 1970 and 1971 for the acquisition of and construction on the castle property. Respondent "takes vehement exception" to petitioners' assertion that he has taken an alternative position with respect to the $608,323.83 amount at issue. Without comment on whether or not there was a computational error for 1972, *500 or whether respondent is taking an alternative position, we are unable to accept petitioners' argument on this point. It is well settled that because income taxes are levied on an annual basis, "[e]ach year is the origin of a new liability and of a separate cause of action." Commissioner v. Sunnen,333 U.S. 591, 598 (1948). Our inquiry in the instant matter, therefore, is "confined to a determination of the amount of deficiency or overpayment for the particular tax year as to which the Commissioner determines a deficiency and as to which the taxpayer seeks a review of the deficiency assessment." Commissioner v. Gooch Co.,320 U.S. 418, 420 (1943). The petition before us concerns a notice of deficiency issued by respondent with respect to petitioners' 1969, 1970, and 1971 taxable years, and we are specifically called upon in that petition to determine whether respondent's determination concerning constructive dividends associated with the castle property for 1970 and 1971 should be sustained. In our view, the stipulated decision fixing, by agreement, *501 petitioners' income tax liability for 1972 is irrelevant to our determination for 1970 and 1971. The decision was presumably entered into freely by both parties, for considerations unknown to us, with full knowledge of all the facts. The decision does not contain any explanation of the bases for agreement, but rather only summarily recites that there are deficiencies in petitioners' income tax in the amount of $2,201,379.13 for 1972. By settling the case before trial, petitioners have foregone the opportunity for an adjudication of facts or conclusions of law on which they might have based a claim of either collateral estoppel or res judicata concerning the constructive dividend issue. Thus, petitioners' claim of double taxation, while sympathetic, is without merit. Turning now to the merits of the issue, respondent here contends that the castle property was intended from the very beginning to be the residence of the petitioners and that petitioners never paid, nor had any intention of paying, Koscot for the castle property or the buildings constructed thereon. Petitioners do not deny that the castle building on the castle property was designed to include living space to serve *502 as their personal residence. Petitioners contend, however, that the castle property as a whole was purchased by Koscot to serve not only as petitioners' family residence, but also for corporate use and that they never intended, during the years at issue, to own the property for their exclusive use. Further petitioners contend, they could not have received constructive dividends during the years at issue because, pursuant to section 1.301-1(b), Income Tax Regs., "a distribution made by a corporation to its shareholders shall be included in the gross income of the distributees when the * * * property is unqualifiedly made subject to their demands." Thus, because they did not reside at the castle property until early 1972 and did not take title to the property until August 1972, after the years at issue, no constructive dividend issue could arise until at least 1972. For the reasons discussed below, we hold for petitioners on this issue. In Benes v. Commissioner,42 T.C. 358, 379 (1964), affd. 355 F.2d 929 (6th Cir. 1966), this Court held that *503 if a corporation builds property, specifically a residence, on behalf of a shareholder, the costs incurred constitute a constructive dividend to the shareholder if: (1) He intends the property to be his own from the very beginning, and (2) he has no intention of repaying the corporation either during or upon completion of the construction. See also Magnon v. Commissioner,73 T.C. 980, 994 (1980). After careful consideration of the evidence on this issue, we are convinced that Koscot did not purchase and construct the buildings on the castle property solely for the exclusive use of Glenn and his family, and that petitioners did not move into the property until 1972; thus, petitioners are not taxable on the acquisition and construction costs for the years at issue. We think it is clear that Koscot purchased the castle property to serve not only as the personal residence of Glenn and his family, but also for almost daily use connected with significant and varied corporate activities. As detailed in our findings, corporate use of the castle property commenced soon after its purchase by Koscot--even before there were any habitable structures. The new property was used *504 not only for Koscot sales and training meetings, but for picnics and boat tours as well. It was a place large enough to accommodate the large crowds of Koscot employees and distributors who came to Florida to see Glenn, the chairman of the board, who, during the years at issue, which coincide with Koscot's spectacular growth, was an inspiration to many. In addition, the structures built by Koscot on the property suggest that they were built not only for petitioners' use, but to accommodate, train, and entertain large groups of people. The boathouse contained an apartment for visiting Koscot officials and a very large room specifically intended as a party room. The castle, although never completed, was designed to contain, in addition to living space for petitioners, meeting rooms, a theater, a lounge, and a meat locker. That the castle property was used regularly for Koscot corporate purposes is confirmed by Alice who testified that after she and Glenn moved into the stables at the castle property in Spring 1972, there were "throngs" of people visiting there all the time; she felt while she was living there that she had no private life. We have no reason to doubt her testimony. *505 Further support of business use for the purposes as testified to by Glenn is found in pictures taken from excerpts from the June, August, and September 1972 issues of The Interplanetary News, a Koscot publication made part of the record, which show a group of 180 Koscot distributors from Italy being entertained at the property. We accept Glenn's testimony that he did not intend to own the castle property until shortly before he actually purchased it from Turner Enterprises in August 1972 at the time during which Turner Enterprises was beginning to collapse because of the protracted civil litigation and criminal prosecutions, described in our findings. Respondent would have us infer from the fact that Glenn purchased the property from Koscot in 1972 at a price far less than the amount Koscot had already expended on its development, and that in later years he has expended much time and trouble to preserve his interest in the property, he necessarily intended from 1970, the time of its purchase, that it be his. We draw no such inference. We do not find it at all indicative of Glenn's intent in 1970 that latter, in 1972, when Turner Enterprises, the corporation Glenn had built *506 from nothing, began to collapse, he attempted to preserve what was left of the corporation. Respondent's argument is, therefore, irrelevant to Glenn's intent in 1970. Because we have concluded that, when Koscot purchased the castle property and began construction thereon, Glenn never intended that it be exclusively his, but rather, the property was also intended for regular business use by Koscot, we do not think petitioners are properly chargeable with constructive dividends for the acquisition and construction costs. At most, the proper measure of any possible constructive dividend to Glenn from Koscot for 1970 and 1971 would be the value of the benefit derived by him for his use of the castle property. Estate of Runnels v. Commissioner,54 T.C. 762, 767 (1970). As indicated in our findings, however, petitioners did not reside at the castle property until the Spring of 1972, [7] when they moved into the stables. Thus, during the years at issue, they derived no benefit from its use, and cannot be charged with constructive dividends for 1970 and 1971. *507 2. Bank Deposits in the Land Account
We next turn to respondent's determination that bank deposits totaling $296,677.20 made by Glenn in 1971 into the Land Account represented unreported income taxable to petitioners for that year. Apparently, respondent reached this conclusion because the account bore Glenn's initials, i.e., "G.W.T. Land Account"; the address given for the account was that of Glenn's personal residence at Oakleigh Lane; and two checks drawn on the account in the total amount of $250,000 were signed by Glenn. It is true that respondent may look to a taxpayer's bank deposits as a reasonable method of determining his income, Marcello v. Commissioner,380 F.2d 494, 497 (5th Cir. 1967), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Boyett v. Commissioner,204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court, and, without more facts than those set forth above, might well have concluded that the deposits into the Land Account represented Glenn's income. We conclude, however, *508 after having heard Glenn's testimony and examined the documentary evidence concerning this issue, that the deposits were from the corporate funds of Turner Enterprises and were used for corporate purposes. Thus, petitioners have carried their burden of proving that such deposits were not from income taxable to them. We find credible Glenn's testimony on this issue. As more fully described in our findings, Glenn used these funds, which were taken from Turner Enterprises, to lend to Bunting, his assistant, so that Bunting could buy Candida Holdings and start his own consulting firm. As he explained, Glenn wanted to replace Bunting, who was not performing well on the job, with Wilder, who was. He feared, however, that if he just fired him, Bunting could split the company. Glenn had wanted to set up Bunting as head of a land development subsidiary of Turner Enterprises; however, Wilder did not like the idea. In order to placate Bunting, while at the same time concealing his actions from Wilder, Glenn used Turner Enterprises funds to set up an account which he called the "G.W.T. Land Account." As the address for the account, he used his personal residence. He gave Bunting $250,000 *509 from the account which Bunting used to purchase Candida Holdings to set up a consulting firm. Under the circumstances as described by Glenn, we do not think the deposits into the Land Account were income taxable to him. He used the corporate funds of Turner Enterprises to handle and solve a corporate problem which he faced in his capacity as chairman of the board. We are satisfied that this was a corporate transaction and that Glenn derived no personal benefit from the funds in question. Respondent contends on brief that Glenn has "offered the most bizarre, improbable, conflicting and self-serving story, which remains totally uncorroborated by any evidence," and urges us to conclude that Glenn took funds from Turner Enterprises and lent them to Bunting "for his [Glenn's] own personal interests." We find Glenn's explanation neither bizarre, improbable, nor conflicting, and while it is uncorroborated, it is also uncontradicted by respondent, who does not identify the personal interests Glenn might have furthered by taking money from Turner Enterprises to lend to Bunting. We note that petitioners were at a disadvantage in presenting any other evidence on this issue because records, *510 concerning the Land Account which Turner Enterprises had turned over to a Grand Jury during 1972, are now missing. We think that by presenting Glenn's credible, unimpeached testimony, petitioners have adequately carried their burden of proof on this issue; the funds in question are not taxable to them. 3.Additions to Tax
The final issue for consideration concerns the additions to tax determined by respondent for negligence under section 6653(a). We have determined underpayments in tax totaling less than one-tenth of those determined by respondent. Coupled with the fact that Glenn, who has a very limited education and admitted that he would not know how to do a tax return, relied totally on his professional accounting staff and his tax attorney for the preparation of his returns for the years at issue, assuming they were doing things properly, we conclude that additions to tax for negligence are inappropriate in this case. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Respondent concedes adjustments numbered 14, 15, and 16 charging petitioner Glenn W. Turner with constructive dividends of $12,364.71, $25,280.57, and $4,935.29 for the years 1969, 1970, and 1971, respectively, as set out in "Exhibit B" in the notice of deficiency. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
3. Many of these properties had been paid for or carried through payments made by Koscot and debited to Glenn's advance account.↩
4. Blueprint plans for the castle, stables, and boathouse were drawn by architect Samuel Ogren (Ogren), who was hired by Sam Joseph (Joseph), a Koscot employee who made many of the decisions concerning the design and construction of the castle. Alice had some input into the design of decorations and furnishings for the castle. She worked with Nancy Ponting, a decorator hired by Koscot. ↩
5. It was Alice's expectation that the only area of the castle which would not be open for business purposes was their bedroom area.↩
6. Petitioners have raised no issue concerning the sufficiency of Koscot's earnings and profits to support dividends for the years at issue.↩
7. Respondent urges us to find, based on testimony given by Glenn during earlier district court proceedings that petitioners moved to the castle property sometime earlier than Spring 1972. We accept the testimony of both Glenn and Alice in which they stated that they did not move to the castle property until 1972. Koscot did not purchase the property until December 1970. Certainly, the planning of and actual construction of the buildings thereon could have taken at least a year to progress as far as completion only of the stables as of Spring 1972. Further corroboration of Glenn's testimony is the fact that on July 26, 1971, when he opened the G.W.T. Land Account, he was still living at the Oakleigh Lane residence, the address he gave for the Land Account.↩